RED BUD REALTY COMPANY *v.* SOUTH.

Opinion delivered July 11, 1910.

1. CORPORATIONS—RIGHT OF MAJORITY OF STOCKHOLDERS TO CONTROL.—The courts will not ordinarily interfere at the suit of a minority shareholder to control the discretion of the directors in management of the affairs of a corporation.   (Page 291.)

2. SAME—RIGHT OF STOCKHOLDER TO SUE FOR.—Where the officers of a corporation fraudulently misappropriated the corporate funds, and the managing body refuses to seek relief against the wrongdoers, a stockholder may sue in his own name to secure the relief to which the corporation is entitled, and may make the corporation a party. (Page 291.)

3. TRUSTS—FOLLOWING TRUST FUNDS.—Whenever a trustee purchases property with trust funds, and takes the title thereto in his own name, equity regards such purchase as made for the benefit of the *cestui que trust,* who may elect whether he will take the property or recover from the trustee the funds thus wrongfully diverted. (Page 293.)

4. SAME—WHEN DO NOT RESULT.—A resulting trust did not arise where a trustee purchased property solely upon .his own credit and subsequently paid for it with trust funds.   (Page 294.)

5. SAME—FOLLOWING TRUST FUNDS.—The rule that property charged with a trust continues to be affected by the trust, though· it be converted into a new form, has no application where an officer of a corporation borrowed money to purchase the shares of two stockholders in the corporation, and pledged such shares to secure the loan, and subsequently used funds of the corporation to pay such loan.   (Page 295.)

6. CORPORATIONS—LIEN UPON STOCK.—A corporation whose funds are used by a stockholder to pay his own debts, for which his shares of stock had been deposited in pledge, has both a statutory and a contract lien therefor upon such shares. (Page 298.)

7. TRUSTS—MINGLING TRUST WITH PRIVATE FUNDS.—Where the chief officer and agent of a corporation mingled the corporate funds with his own, his dealings with such funds are narrowly scrutinized in equity; and, if he does not keep clear, distinct and accurate ac-

counts with proper vouchers, all presumptions are against him, and doubts are taken adversely to him.. (Page 299.)

8. SAME—WHEN EXPENSES OF TRUSTEE DISALLOWED.—Where a trustee mingled his private business with the trust business, and incurred in his own business expenses of the same character as he sought to charge against the trust estate, it was not an abuse of discretion to disallow such expenses, if they were not satisfactorily established. (Page 299.)

9. CORPORATION—VALIDITY OF STOCKHOLDERS' MEETING—NOTICE.—A stockholders' meeting, of which absent stockholders had no proper notice, is illegal, and action then taken was not binding. (Page 300.)

10. MASTER—CONCLUSIVENESS OF REPORT.—The report and findings of a master appointed by the court upon its own motion are persuasive merely upon the chancellor, and not conclusive. (Page 300.)

11. CORPORATION—RIGHT OF OFFICER TO COMPENSATION.—The president of a corporation is not entitled to any compensation for performing the ordinary duties of his office unless a contract to that effect is either expressly or impliedly made with its governing body. (Page 301.)

12. SAME—RIGHT OF OFFICER TO COMPENSATION.—In determining whether an implied contract upon the part of a corporation exists to pay its president for services in its behalf, the nature of the corporation and of its business, the nature and extent of the services rendered, the comparative amount and value of the services of other officers of the corporation and all other circumstances of the case must be considered. (Page 301.)

13. SAME—ACCOUNTING OF OFFICER—LIABILITY FOR INTEREST.—Where the chief officer of a corporation, with the consent of its directors, acted as custodian of its funds and used a part of them in his own business, and deposited the remainder in a bank, he will be chargeable with interest only on so much of the funds as he used. (Page 302.)

14. SAME—ADJUSTMENT OF CLAIMS OF STOCKHOLDERS—ALLOWANCE OF ATTORNEY'S FEES.—Where the subject-matter of a suit involved the individual rights and interests of the stockholders of a corporation, as distinguished from those of the corporation itself, it was proper to make no allowance for attorney's fee to either party. (Page 303.)

Appeal from Baxter Chancery Court; *George T. Humphries,* Chancellor; reversed.

### STATEMENT BY THE COURT.

This was an action instituted by one of the minority stockholders of a business corporation for the purpose of making one of its directors and officers account for the alleged misappropriation of its funds, and to declare him a trustee of certain property claimed to have been purchased by him with its money.

The Red Bud Realty Company was organized as a corporation under the laws of the State of Arkansas on the 13th day of May, 1903, with a capital stock of $50,000, which was divided into two thousand shares of the par value of $25 each. The original stockholders were J. C. South, Thomas Combs, T. J. McClean, H. Devereaux, W. V. Powell and Frank Tuttle, each of whom was the owner of four hundred shares of said capital stock except W. V. Powell, who was the owner of 399 shares and Frank Tuttle, who was the owner of one share. The general nature of the business of the corporation consisted in purchasing, selling and dealing in real estate. The principal, and in fact the only, asset of the corporation at its organization was a tract of land situated in Baxter County, Arkansas. The White River branch of the St. Louis, Iron Mountain & Southern Railway Company was being built at this time through Baxter and other counties of north Arkansas, and this tract of land was located upon its line of railroad. The purpose of the corporators was to establish a town site upon this tract of land and dispose of the lots into which it would be divided. In pursuance of that object, the land was laid out into lots and blocks, and the town of Cotter was established thereon, and the place of business of the corporation was located at that town. At its organization, W. V. Powell was elected president, J. C. South was elected secretary, and Thomas Combs treasurer, of the corporation, and by a resolution of the board of directors Combs was employed to manage the affairs of the company and make sale of the lots, and for his services it was stipulated that he was to receive a stated monthly salary. He at once established the office of the corporation at Cotter, and during the years 1903 and 1904 he sold a great number of lots and collected the purchase money therefor.

In May, 1904, W. V. Powell purchased from T. J. McClean and H. Devereaux their stock in the corporation, and thereby became in effect the owner of three-fifths of the shares of its capital stock. Later in the year he stated to South and Combs, the remaining shareholders, that he was impatient at and dissatisfied with the slowness of the sale of the lots, and proposed that the lots should be sold on what is commonly called the "drawing plan." He proposed that each lot should be sold at the price of $50, and that he would select agents who would

make the sales upon a commission. At that time Powell was a resident of St. Louis, Missouri, and he proposed that he would carry out this plan for the sale of the lots from that place. At first South and Combs demurred to this proposal, but finally passively acquiesced in the plan. Thereupon, Powell selected agents and proceeded with his proposed scheme of making sale of the lots, and in this manner sold something in excess of eight hundred lots during 1904 and 1905. On November 23, 1905, the lots were awarded to the purchasers by a drawing held at Cotter. From time to time, and up to November 23, 1905, Powell collected the purchase money of these lots, which amounted in the aggregate to something in excess of $40,000.

In April, 1905, Powell claimed that he sold four hundred shares of the stock of the corporation to R. X. DeGraw, and that in June, 1905, he sold four hundred shares to L. L. Doyle, and soon thereafter told South and Combs of these sales. The transfer of these shares of stock was never entered on the books of the company, and certificates of the transfer were never filed with the proper public official; but in Otcober and November, 1905, both DeGraw and Doyle met with Powell, South and Combs at Cotter and participated with them at meetings when the business of the corporation was discussed and transacted. It is claimed by Powell, DeGraw and Doyle that the latter gentlemen were duly elected directors of the corporation at one of these meetings, but this is denied by South and Combs. The minutes of the proceedings of the board of directors were very imperfectly kept; the meetings were very irregular, and conducted very informally. The testimony, however, tends to prove that South and Combs recognized these two as owners of shares of the stock, if not as directors. No annual meeting of the stockholders of this corporation was ever called or held from its organization until in October, 1906, when such a meeting was attempted to be held at Little Rock, Arkansas.

About the time of, and frequently after, the drawing and awarding of the lots, which was had upon November 23, 1905, both South and Combs requested Powell to make an accounting of the funds received by him for the lots. He claimed, as a reason for postponing the accounting, that there were certain expenses which were not liquidated, and others that might probably

be incurred, and also objected to paying the money over to Combs, the treasurer, because the bank at Cotter was insecure to keep such large funds. Upon their becoming more insistent for a settlement, he paid to Combs $2,000 and to South $1,000, but still failed to make an accounting.

In September, 1906, as president of the corporation, Powell called a special meeting of the stockholders, to be held at Little Rock, Arkansas, on October 15, 1906. He testified that he mailed notices of the meeting to each of the shareholders, but South claimed that he never did receive such notice. On the stated day all the shareholders except South met at Little Rock, Arkansas; and held an alleged stockholders' meeting of the corporation. They reduced the number of directors from five to four, and elected Powell, Combs, DeGraw and Doyle directors, and changed the place of business of the corporation from Cotter, in Baxter County, to Roe in Monroe County. These alleged directors then met on the same day at the same place, and elected Combs president, Powell vice-president and Doyle secretary and treasurer of the company. At this meeting Powell presented an account of the collections and disbursements made by him of the purchase money of the lots which had been sold through his agency. This account, without reference and without investigation, was immediately approved. A dividend was then declared which Powell claimed disposed substantially of all the funds of the corporation. He claimed that the funds in the hands of Combs were sufficient to pay the amount of the dividends payable to South and Combs, and that he would pay out of the funds in his hands the dividends payable to himself, DeGraw and Doyle. He also claimed that this left in his hands a balance of $659.20 a part of which he disbursed in paying the expenses of the shareholders in attending the above meeting, and subsequently he paid the remainder as a retainer fee to his attorney in defending this suit.

On November 30, 1906, J. C. South as sole plaintiff instituted this suit in the Baxter Chancery Court, making W. V. Powell, L. L. Doyle, R. X. DeGraw, Thomas Combs and the Red Bud Realty Company parties thereto. In his complaint, amongst other things, he alleged that Powell was attempting to fraudulently appropriate to his own use funds of the corpora-

tion, and had wrongfully misappropriated same; that the statement made by him of expenditures was false, and was for the purpose of depriving the other shareholders of the assets of the company; that Doyle was a brother-in-law, and DeGraw was a business associate and close friend of Powell, and that they did not actually own any of the stock of the corporation, but were merely representatives and dummies of Powell; that Powell, by thus controlling the majority of the stock and the affairs of the corporation, was misappropriating its funds to the injury of the minority shareholders.  Subsequently, he alleged in an amended complaint that Powell had purchased the shares of stock from McClean and Devereaux (amounting to eight hundred shares) with money of the corporation, and on this account the purchase of said shares resulted to the benefit of the corporation, and that it became thereby the equitable owner of the shares.  He also alleged that Powell had deposited with Combs these certificates of stock, and also the stock which had been issued to him, in order to secure the payment of all indebtedness due by him to the corporation.  He asked that the parties be restrained from disposing of any of the above shares of stock; that Powell be required to account for all funds of the corporation, and that a lien be declared upon the shares of stock deposited with Combs for the payment of the amount due by him; and, finally, that the affairs of the corporation be wound up and its assets distributed amongst its shareholders according to their respective interests.

Subsequently, Combs aligned himself as a party plaintiff in the suit, and adopted as his own the complaint of South.  The other defendants interposed a demurrer to the complaint, which was overruled.  They then made answer thereto, in which they denied the various allegations of the complaint, and in substance alleged that the affairs of the corporation had been properly conducted, and that Powell had correctly and honestly accounted for all its funds which he had received.

When the original complaint was filed, a temporary injunction was issued in accordance with its prayer, and was continued in force by the lower court.  Thereafter, the chancellor appointed receivers to take charge of the assets of the corporation, which then consisted of some unsold real estate, office fixtures and notes.  Subsequently the chancery court upon its own motion

appointed a master, with directions to take testimony relative to all lots sold by Combs and all collections and disbursements made by him; also relative to all lots sold through the agency of Powell, and to all collections and disbursements made by him; and to state an account between each of them and the company. The master was also directed to state the payments that had been made to each of the shareholders and to state the account of each of them with the company.

The master took testimony in pursuance of said order, and made a report in compliance with its directions. In regard to the collections and disbursements of the funds of the corporation made by Powell, he reported that Powell had collected funds belonging to the corporation amounting to $41,650.25. In effect, he reported that he did not pass upon the correctness of the items of expense, salary, etc., which were presented by Powell in his account, but stated that an account of these expenses, etc., had been presented at the alleged meeting of the board of directors at Little Rock on October 15, 1906, and by that body approved, and that the legality of that meeting was questioned. He found that the following were the total items of expenses, etc., which were presented to that meeting:

Expenses of advertising and of stockholders, and commissions of agents..........................$17,855.74
Amounts refunded to purchasers of lots............   1,385.00
Salary as superintendent, W. V. Powell............   1,500.00
Expenses of W. V. Powell.........................   1,000.00

Making a total of expenses, etc...............$21,740.74
And leaving a balance to be accounted for by
    Powell of .............................$19,909.51
He also found that out of this balance Powell had theretofore paid to South $1,120 and to Combs $2,020.

In view of our determination of the issues and matters involved in the case, we do not deem it necessary to further detail the statement made by the master. Exceptions were filed to the report by all the parties.

The chancery court, without formally passing on the master's report, examined all the testimony and made findings of its own. It found that at the organization of the Red Bud Realty

Company J. C. South and Thomas Combs became each the owners of four hundred shares of its capital stock, and that Powell became the owner of 399 shares and that each of these parties is now the owner respectively of those shares. It found that Powell had purchased the shares of stock of Devereaux and McClean with the funds of the corporation, and upon said purchase the stock became the property of the Red Bud Realty Company in the hands of Powell as trustee only; that DeGraw and Doyle were in fact only the representatives of Powell, and were not *bona fide* purchasers of the said stock. It declared that these shares were the property of the corporation, and that as a result South, Combs and Powell were in effect the owners of one-third each of its assets. It also found that the stock-holders' and directors' meetings which were held in Little Rock, · Ark., in October, 1906, were without authority of law, and that the proceedings of these meetings and the actions there taken were illegal and void. It found that the articles of incorporation of the company provided that the place of business · of the cor-poration was located at Cotter, Ark., until some other place should be selected by its board of directors, and that the direc-tors had never selected any other place, and on this account that such meetings could only be held at Cotter; also that, accord-ing to the by-laws of the company, the annual meeting of its stockholders was fixed for May 13 of each year, and that this time had never been changed by the board of directors; also that legal notice had not been given of said meetings; and for these various reasons it held that said meetings were illegal. It further found that the account made by Powell of his expenses and expenditures was wholly unsustained by proper and satis-factory testimony, and for this reason it disregarded same. It found from the evidence that Powell was entitled to a credit of $15 per lot for all expenses and expenditures made by him in the sale thereof, making a total of $12,120; and that he was also entitled to a credit of $1,385 for cash refunded on lots, and of $676.46 for cash paid for supplies. It also allowed him a credit of $4,982 for the amount paid by him for the McClean and Devereaux stocks. It approved the finding of the master that Powell had collected funds belonging to the corporation amount-ing to $41,650.25, but charged him with the further sum of $600 on account of dividends which he had collected on the Devereaux

and McClean stocks and which it found belonged to the company. It thus found a net balance due from Powell to the company of $23,086.79; that out of this fund Powell had paid to Combs $2,020, and to South $1,120, thus leaving a net balance of $19,946.79, due by Powell to the corporation.

The lower court in effect approved the findings of the master relative to the account of Thomas Combs. It found that he had collected $20,063.82, and had disbursed for expenses, for purchase money of the original land, etc., $12,409.96, leaving a balance of $7,632.86 for the company; that of this balance he had paid in dividends the following: To Powell $900, to South $3,040 and to himself $300, thus leaving a net balance of $3,413.86 due by him to the corporation.

The court then found that South, Combs and Powell were each the owners of and entitled to one-third of the net sums due by Powell and Combs to the company, less the amounts which had been respectively received by them, and stated the account if each of them with the company accordingly.

From this decree defendants Powell, Doyle and DeGraw have appealed to this court.

*Manning & Emerson,* for appellants.

The necessity of a meeting of the board of directors for the transaction of the business of the corporation may be waived by the stockholders. 89 Ark. 446. A corporation is liable for the acts of its agents. 7 Cranch 299; 8 Conn. 191; 27 Conn. 853; 39 Ill. 609; 4 Allen 20. A contract to pay the officers for services as such may be implied. 6 Ark. 292; 151 Mass. 433; 13 Col. 4; 45 Ga. 34; Helliwell on Stockholders, 483; 74 Mich. 226; 36 La. Ann. 138; 14 Hun 483; 37 Miss. 202; 53 N. E. 232; 50 So. 658. A master's findings, based on conflicting testimony, will not be disturbed. 125 U. S. 136; 144 *Id.* 104; 129 *Id.* 512; 31 Fed. 246; 23 Pac. 671; 15 S. E. 253; 53 Me. 214; 23 N. J. Eq. 495. The findings of a chancellor are persuasive. 43 Ark. 307; 50 Ark. 185; 55 Ark. 112; 75 Ark. 75. But a master's findings are as conclusive as the verdict of a jury. 74 Ark. 336. The presumption that a person to whom a letter was addressed and mailed received it is rebuttable. 73 Ark. 194; 74 Ark. 18. The trust must have been coeval with the deed, or it cannot exist at all. 2 Jones, Ch. 405; 47 Ark. 358. The evi-

dence that the purchase was made with trust funds must be clear.   2 Pom. Eq. 623; 75 Ark. 451.   An innocent purchaser will be protected.   4 Ark. 301.

*Z. M. Horton, Allyn Smith* and *McCaleb & Reeder,* for appellees.

Unless the transcript shows that it contains all the evidence in the case, the court will presume that there was sufficient evidence to support the findings of the chancellor.   70 Ark. 127; 72 Ark. 21; 77 Ark. 195; 38 Ark. 477; 36 Ark. 484; 67 Ark. 287.   The burden is upon appellant to show that the finding of the chancellor was clearly against the weight of the evidence.   24 Ark. 431; 44 Ark. 216; 67 Ark. 287; 68 Ark. 314; *Id.* 134; 77 Ark. 305.   The complaint states a cause of action for equitable relief.   17 L. R. A. 412; 93 Mich. 97; 52 N. W. 218; 21 Pac. 1133; 18 How. 331; 12 Blatch, 280; 104 Mass. 378; 6 Allen 52; 40 N. H. 567; 11 Ch. Div. 97; L. R. 5 Eq. 464; 27 Fed. 625; 26 Conn. 456; 24 Me. 9; L. R. 2 Ch. App. 737; 4 Hare 49; 18 How. 480; 18 Ark. 338; 8 Blatch. 347; 41 Ga. 454; 38 N. W. 772; 7 So. 108; *Id.* 398; 88 Ky. 54; 16 So. 6; 42 N. E. 851; 159 Ill. 489; 15 S. W. 1094; 24 Atl. 499; 52 Fed. 611; 11 So. 344; 90 Hun 254; 72 Fed. 591; 40 N. Y. S. 1042; 9 L. R. A. 527; 31 So. 683; 77 N. Y. S. 898; 91 Fed. 311; 33 Atl. 889; 167 Fed. 619; 76 N. Y. S. 712; 47 Atl. 877.   No demand was necessary.   8 Blatch. 347; 38 N. W. 772; 47 N. W. 361; 21 Pac. 1188.   An attempt to vote unlawful salaries to the officers is an additional ground for equitable interference.   56 N. Y. S. 807; 22 Fed. 883; 73 N. Y. S. 403; 64 Fed. 253; 27 Conn. 170; 68 Ill. 570; 37 N. Y. 317; 18 Ark. 341.   A party waives the error in the admission of incompetent testimony by resorting to testimony of the same kind.   66 Ark. 588; *Id.* 292; 67 Ark. 47; *Id.* 531.   The decree is sustained by the evidence. 6 L. R. A. 429; 125 N. C. 380; 26 L. R. A. 681; 39 Kan. 230; 9 Kan. 97; 74 Ark. 339; 76 Ark. 339.   Powell was a trustee.   5 L. R. A. 363; 66 *Id.* 261; 2 *Id.* 534; 88 U. S. 616; 57 S. E. 242; 68 Ark. 542; 49 Ark. 242; 40 Ark. 393.   A purchaser of stock can take no greater interest than the seller has to convey.   60 Ark. 204.   The meeting of the directors held in Little Rock was void.   54 Ark. 58; 55 Ark. 473.

FRAUENTHAL, J. (after stating the facts). 1. This was an action instituted by one of the minority shareholders of a corporation to recover in part assets not belonging directly to such shareholders, but in effect to recover assets belonging to the corporation itself.

A stockholder does not acquire any estate in the property of a corporation by virtue of his stock; the full legal and equitable title thereto is in the corporation, and a cause of action for the recovery of its property or for a violation of its rights thereto is in the corporation. The management and control of the affairs of a corporation rest with its board of directors, and the general rule is that courts will not ordinarily interfere at the suit of a minority shareholder to override and control the discretion of the directors in the management of the business and affairs of the corporation. The majority of the stockholders ordinarily have the right to conduct and control its affairs and property.

It is urged by counsel for defendants that the cause of action, if any, set out in the complaint is that solely of the corporation; and, inasmuch as appellants represent the majority of its stock, they have the right to manage its affairs and, within their own discretion, to determine all questions relative to the corporate property and management; that therefore they have the right to make settlements with those who have business relations with it, and cannot be compelled to litigate where they do not consider it advisable or just to do so. On this account, they insist that the demurrer to the complaint should have been sustained.

But, while the directors of a corporation have the management of its business and property, nevertheless they also occupy a relation of trust with reference to its stockholders. The stockholders own the shares, whose value is dependent upon and is affected by the conduct of the directors, and therefore the directors owe certain fiduciary duties to the stockholders. The cause of action primarily exists in the corporation for the recovery of its assets and for the violation of its rights to same. But where the directors are guilty of breaches of trust in their management of the affairs of the company, and through fraud or gross negligence refuse, or virtually refuse, to institute an action for the recovery of its property wrongfully diverted or

of its funds misappropriated, then a stockholder has a right to maintain in equity such an action to secure those rights and prevent a failure of justice. This right of action arises to the shareholder whenever the directors and officers of the corporation are pursuing a course for their own personal gain and in fraud of the rights of the shareholders.

In the case of *Hawes* v. *Oakland,* 104 U. S. 450, in speaking of the right of a shareholder to institute a suit relative to corporate property in his own name, the court says: "We understand the doctrine to be that to enable a stockholder in a corporation to sustain in a court of equity in his own name a suit founded on a right of action existing in the corporation itself, and in which the corporation itself is the appropriate plaintiff, there must exist as the foundation of the suit * * * such a fraudulent transaction completed or contemplated by the acting managers, in connection with some other party, or among themselves, or with other shareholders, as will result in serious injury to the corporation, or to the interests of the other shareholders."

And, as is said in the case of *Miner* v. *Belle Isle Ice Co.,* 17 L. R. A. 412, "there is no doubt of the power of a court of equity, in case of fraud, abuse of trust, or misappropriation of corporate funds, at the instance of a single stockholder, to grant relief, and compel a restitution; and where the holders of the majority of the stock control the directorate, and are themselves the wrongdoers, without any showing that the directors have been requested, or the corporation has refused, to act." 3 Pomeroy, Eq. Jur. § 1095; Ex parte *Booker,* 18 Ark. 338; *Dodge* v. *Woolsey,* 18 How. 331; *Hand* v. *Dexter,* 41 Ga. 454; *Marcuse* v. *Gullett Gin Co.,* 52 La. Ann. 1383; *Brewer* v. *Boston Theater,* 104 Mass. 378.

Where, therefore, the officers of a corporation fraudulently misappropriate the corporate funds in any manner, and its managing body refuses, or in effect refuses, to seek relief against the wrongdoers, a single stockholder may institute a proceeding in his own name to secure the relief to which the corporation is entitled; and in such suit he should make the corporation a party. We think that the complaint in this case made sufficient allegations to invoke the aid of a court of equity at the instance of one of the minority stockholders of the corporation.

2. The chancellor found that Powell, one of the directors, and the chief officer of the corporation, had misappropriated the funds of the corporation and had used same in payment for the Devereaux and McClean stocks, which he purchased. He declared that a trust thus resulted in favor of the corporation which a court of equity would enforce, and that thereby the corporation became the equitable owner of the stock so acquired.

It is well settled that whenever a trustee purchases property with trust funds, and takes the title thereto in his own name, equity will regard such purchase as made for the benefit of the *cestui que trust*. In passing upon this question, the Supreme Court of the United States in the case of *National Bank* v. *Insurance Company*, 104 U. S. 54, said: "The master of the Rolls, Sir George Jessel, showed that the modern doctrine of equity, as regards property disposed of by persons in a fiduciary position, is that, whether the disposition of it be rightful or wrongful, the beneficial owner is entitled to the proceeds, whatever be their form, provided only he can identify them * * *; and that there is no difference between investments in the purchase of lands, or chattels, or bonds, or loans, or moneys deposited in a bank account." By this doctrine equity maintains the beneficial rights of property, and where a trustee uses trust funds in the acquisition of property, the *cestui que trust* may elect whether he will take the property or recover from the trustee the funds thus wrongfully diverted. 3 Pomeroy, Eq. Jur. § 1049; *Green* v. *Green*, 46 L. R. A. 525; *Holmes* v. *Gilman*, 138 N. Y. 369; *Twohy Mercantile Co.* v. *Melbye*, 78 Minn. 357; *Dyer* v. *Dyer*, 1 White & Tudor, Lead. Cas. in Eq. 314.

But, in order to constitute such a resulting trust, the payment of the purchase money must be made before or at the time of the acquisition of the property; a subsequent payment will not by relation attach the trust to the original purchase. In the case of *Botsford* v. *Burr*, 2 Johnson's Ch. (N. Y.) 415, Chancellor Kent said: "The trust must have been coeval with the deeds, or it cannot exist at all. * * * The trust results from the original transaction at the time it takes place, and at no other time, and it is founded on the actual payment of the money and on no other ground. It cannot be mingled with any sub-

sequent dealings whatever." *Rogers* v. *Murray,* 3 Paige, Ch., 390; *Dyer* v. *Dyer, supra.*

Following this doctrine, this court in the case of *Sale* v. *McLean,* 29 Ark. 612, said: "The law is, 'that if a purchase of property be made, and the deed is taken in the name of one party, whilst the consideration is given or paid by another, a resulting trust immediately arises by virtue of the transaction, and the person named in the conveyance will be a trustee for the party from whom the consideration proceeds.' * * * The purchase money must be paid or secured by another at the same time or previously, and as part of one transaction. * * * The trust must immediately arise by virtue of the purchase. * * * If no trust was created at the time of the purchase, none can arise afterwards, because the rights of the parties must of necessity become then fixed."

And in *DuVal* v. *Marshall,* 30 Ark. 230, it is held that, in order to create a resulting trust in favor of one who pays the purchase money for property bought in the name of another, the payment must be contemporaneous with the purchase.

In the case of *Milner* v. *Freeman,* 40 Ark. 62, this court further said: "It is impossible to raise a resulting trust so as to divest the legal estate of the grantee or his heirs by the subsequent application of the funds of a third person to the satisfaction of the unpaid purchase money." *Humphreys* v. *Butler,* 51 Ark. 351.

In the case at bar the undisputed testimony shows that Powell purchased from McClean and Devereaux their stock in the corporation in May, 1904. He borrowed the money with which to pay for this stock from the Central National Bank of Carthage, Missouri, and executed to that bank his note therefor with personal security, and also attached thereto as a pledge the stock thus purchased. When that note matured, he borrowed the same amount from the Bank of Aurora, of Aurora, Missouri, and with the proceeds paid the note. He then executed to the Bank of Aurora three notes for the money thus loaned to him, as follows: $1,500 maturing February 25, 1905; $1,500 maturing March 25, 1905; $2,200 maturing April 18, 1905. The evidence tended to prove, and the chancellor so found, that when these notes matured Powell paid them with funds in his hands

which belonged to the Red Bud Realty Company. In fact, the evidence proved that he gave checks of the Red Bud Realty Company upon the funds of that corporation, on deposit in the Missouri-Lincoln Trust Company of St. Louis, Missouri, to pay these notes severally on the dates of their maturity. Without detailing this testimony, we think that it abundantly sustains the chancellor in his finding that Powell thus used the money of the Red Bud Realty Company with which to pay these notes. But the evidence as conclusively establishes the fact that he did not use the money of the Red Bud Realty Company at the time he purchased the stock, but that he acquired and purchased the shares, long before he used the funds of the corporation, with money which he obtained upon his own credit. The purchase of the shares and the taking of the money of the corporation were not coeval, and were not one transaction. The money of the corporation was used long after the purchase; and, while it did go to pay the notes of Powell, it was in fact in no way connected with the transaction of the purchase of the shares. Powell had the right to purchase the stock from the shareholders of the company for his individual benefit; and, although a director and officer of the corporation, he violated no trust when he did so. Nor do we think that the testimony warrants any finding that Powell, at the time he made the purchase, contemplated paying for these shares of stock with funds belonging to the corporation. At the time he made the purchase he was not the treasurer of the corporation, nor did he have any moneys of the corporation in his hands. He made the purchase openly, and the appellees, who were the other shareholders of the corporation, knew of his purchase of these shares of stock many months before he made a suggestion of managing the sale of lots, and recognized his ownership thereof. He purchased the stock with money of his own, secured in the ordinary and usual course of business. He pledged the 399 shares of stock owned by himself from the time of the creation of the corporation, and also gave a perfectly solvent individual as surety on his note to obtain the money, as well as pledging the shares thus purchased. He was engaged in other business, and had other property at the time, and was perfectly solvent. At the time he used the money of the corporation there was

really due from the corporation to Powell, for the expenditures which he had made for the expenses of the sale of the lots and for his interest in the net proceeds of such sales, as a shareholder (which was substantially an one-fifth interest), an amount largely in excess of the money of the corporation which he used to pay his individual debts. We cannot say from the testimony or from the circumstances of this case that he did not act in good faith when he purchased the stock from McClean and Devereaux, or that he contemplated at that time paying therefor with money which he would subsequently obtain wrongfully from the corporation.

But counsel for appellee urge that when Powell misappropriated the funds of the corporation in February and March, 1905, and with such funds paid the notes which he had given to the Bank of Aurora, a constructive trust in favor of the corporation was impressed upon the shares of stock which Powell had purchased, because the stock was but the product or substitute for the funds of the corporation. They invoke the rule in equity that all property charged with a trust continues subject to and affected by the trust, however much it may be altered or changed in its nature or character. This is a well established doctrine of equity. Courts of equity will protect the rights in property taken by a wrongdoer, and will follow it through whatsoever changes and transmutations it may undergo in his hands. As is said by Prof. Pomeroy: "Whenever one person has wrongfully taken the property of another and converted it into a new form, the trust arises and follows the property or its proceeds." 3 Pom. Eq. Jur. § 1051.

The reason of the doctrine is stated by Lord Ellenborough in the case of *Taylor* v. *Plumer,* 3 Maule & S. 562, in language that has been often quoted: "For the product or substance for the original thing follows the nature of the thing itself, so long as it can be ascertained to be such, and the right only ceases when the means of ascertainment fail."

But, before such a trust arises, it is essential that the fund thus wrongfully appropriated and converted be traced to the acquisition of the new species of property or investment upon which it is sought to impress the trust. The misappropriated funds must be traced to and located in the changed form or

species of property. It can not be pursued and located in the general mass of the wrongdoer's property because such wrongdoer has incurred indebtedness generally in the acquisition of the general mass of his property and has subsequently applied the misappropriated funds to the payment of his debts generally.

In the present case Powell simply owed the Bank of Aurora for money which he had borrowed, and to secure the payment of that loan he had pledged the McClean and Devereaux stocks and other stock. It was the same as if he had given to the bank a mortgage upon land or other property owned by him to secure the debt due by him to the bank. When this debt to the bank matured, he used the funds of the corporation with which to pay that indebtedness. The funds of the corporation thus passed to the bank to pay the debt due to it. The funds were not converted into the stocks. Nor can it be said that the funds are traced to or located in the stocks any more than it can be said that they can be traced to and located in any other property then owned by Powell, or to any other property owned by him and pledged for the debt of this bank. The moneys of the corporation only went to discharge the debt that he owed. To the extent that the funds of the corporation wrongfully taken discharged a lien upon property owned by Powell equity would impress upon such property still in the hands of Powell a lien for its repayment.

We are cited to the case of *Atkinson* v. *Ward,* 47 Ark. 533, to sustain the contention of appellees. But we do not think that the decision in that case is different from our present holding. In that case the trustee, Ward, had acquired a lot with money owned by him, and later had erected a storehouse upon the lot with money entrusted to him by Atkinson & Company. It was there held that the improvements upon the lot were acquired with the funds of Atkinson & Company, which Ward had wrongfully used, and that the amount of the funds of Atkinson & Company used in the making of said improvements should be declared a lien on the premises. In that case it was said: "But in the case in hand a trustee diverts the trust fund from its proper channel and converts it into a house on his own land. The fund has been followed and definitely located there." And the court impressed a lien thereon for the amount of the funds so taken. It did not declare the *cestuis que trust* (Atkinson & Com-

pany) the equitable owners of the premises. And to the same effect is the case of *Dyer* v. *Jacoway,* 42 Ark. 186.

And so in the case in hand the corporation has a lien in equity upon the shares of stock which Powell pledged to the Bank of Aurora to secure his debt to it, because Powell used the money of the corporation wrongfully and applied it to the discharge of that debt and of the lien on that property. Powell, however, did not with the funds of the corporation acquire these shares of stock, nor have these funds been converted into these shares or into any property that has been transmuted into these shares. It follows that these shares of stock did not in equity become the property of the corporation. The corporation has only a lien thereon to the extent of the debt secured thereby which was discharged with its funds. But it is not necessary in this case to impress upon the shares of stock which were pledged to the Bank of Aurora a lien in favor of the corporation for the repayment of the money of the corporation which Powell used to discharge said debt to the bank and the lien on these shares of stock, by way of this equitable construction. Powell is answerable for all funds of the corporation which he collected and must account therefor; and for his indebtedness to the corporation the statute gives to the corporation a lien on the stock in his own name, and as will be seen hereafter the stock acquired from McClean and Devereaux was pledged to the corporation to secure all such indebtedness; so that the corporation had a lien thereon for all indebtedness due to it by Powell, including any funds he misappropriated.

3. The chancellor found that Powell's account of his expenses and expenditures was not supported by proper and satisfactory testimony; that his dealings with, and misappropriation of, the funds entrusted to his charge tainted his account with such suspicion that he disregarded it, and thereupon determined, from the other testimony in the case, the amount that should be justly and equitably allowed him for said expenses incurred and expenditures paid out by him for the corporation. We can not say that this finding of the chancellor is contrary to the clear preponderance of the testimony. Powell occupied a position of trust with reference to the corporation, and also a fiduciary relation to its shareholders. He was its chief officer

and, as its agent, had collected large sums for it. These he mingled with his own funds, he says himself; and the chancellor has found (and we think his finding is sustained by the evidence) that he used the money of the corporation in order to pay his own debts.

In the case of *McNeil* v. *Gates,* 41 Ark. 264, it is said: "The dealings of a trustee with the trust property are narrowly scrutinized by courts of equity. If impugned, they cannot stand unless characterized by the utmost good faith and candor. And the burden is upon the trustee to show their entire fairness." Where the duty of the trustee or agent requires it, he must keep true, regular and accurate accounts of all his transactions, both of receipts and disbursements, and should render a full and complete statement, supported by proper vouchers. As is said in the case of *Landis* v. *Scott,* 32 Pa. St. 495: "If he does not, every presumption of fact is against him. He cannot impose upon his principal, or *cestui que trust,* the obligation to prove that he has actually received what he might have received," or that he has not expended what he claims to have paid out. If he does not keep clear, distinct and accurate accounts, with proper vouchers, "all presumptions are against him, and doubts are taken adversely to him." 2 Perry on Trusts, § 821; 28 Am. & Eng. Ency. Law, p. 1095; *Gale* v. *New York Hay Co.* 66 N. Y. Supp. 291; *East* v. *Key,* 84 Ark. 429.

The expenses and expenditures for which Powell seeks credit were incurred, he claims, in making the sale of the lots. The items that he names are expenses of maintaining an office and the payments made by him for advertising and to agents. He was at the time engaged also in the management of an individual business of his own in which he maintained an office and incurred the same character of expenses for which he asks reimbursement from this corporation. The testimony tends to prove that he mingled his own affairs and business with those of the company, and we do not think that the court abused its discretion in finding that his accounts of these expenses were surrounded with doubt, and therefore were not satisfactorily established.

He did not present proper and competent vouchers of his expenses for the payments claimed to have been made to agents and for advertising. He claims that the original books and ac-

counts were accidentally destroyed by fire, and on this account were not produced; but we cannot say from the testimony that the chancellor clearly erred when he disregarded his account and allowed him all these expenses and expenditures upon the basis of $15 per lot. The testimony tends to prove that Powell stated that the lots could be sold upon the plan which he suggested for $5 commission to agents per lot and $5 per lot for advertising, or at most for $15 per lot for commissions and expenses. The chancellor allowed him for his expenses and expenditures this largest amount.

It is urged that this account was presented to the board of directors of the corporation at the meeting held in October, 1906, at Little Rock and by it was approved; that the discretion and right to approve the account was within the power of the managing body of the corporation, and its action should, therefore, be conclusive upon the court. But the chancellor found that the meeting of the alleged directors, and also the meeting of the stockholders at that time and place, were illegal, and the proceedings then had void. From the findings of the chancellor as to the provisions of the articles of incorporation and by-laws of this company, and that proper notice was not given of these meetings, we think the chancellor was correct in his conclusion in holding that the meetings were not legally held, and that the actions there taken were not binding. 1 Thompson on Corporations, § § 689-709-710; 10 Cyc. 321; *Simon* v. *Sevier Ass'n,* 54 Ark. 58.

It is also urged that the master made a finding approving these items of the account, and that his finding should not be disturbed; but we do not so understand the report of the master. He only reported that the account was presented to and approved by this alleged board of directors at said meeting in Little Rock. He does not state that he had himself examined the various items of the account, or that he had taken any testimony relative to the items thereof other than the account itself which was filed by Powell; nor does he state that he finds that these items of the account are correct, and that they should be allowed. The report and findings of a master appointed by the court of its own motion, however, are not conclusive upon the chancellor. They are only advisory. While they are highly persuasive, and should not be lightly disregarded, the chancery court has the

power, and it is its duty, to pass its own judgment upon the findings of the master in the light of the evidence adduced. *Claypool* v. *Johnston,* 91 Ark. 549; *Carr* v. *Fair,* 92 Ark. 359. And the findings made by the chancery court upon matters submitted to a master appointed by it upon its own motion will be sustained upon appeal in this court if they are not against the preponderance of the evidence. *Claypool* v. *Johnston, supra.*

4. It is urged by counsel for Powell that he was entitled to compensation for services rendered by him relative to the sale of the lots which were made through his agency. For these services he asked for an allowance of $1,500, and the chancellor refused to allow him any compensation therefor. Under the testimony adduced in the case, we cannot say that the chancellor erred in this ruling. Powell was the president of the corporation, and one of its chief stockholders. The company was a joint enterprise for the promotion of the sale of the lots of a townsite, which was the sole asset of the corporation. All the members of the company were engaged in advancing the enterprise, and none of them received compensation for such acts or services.

The president of a corporation is not entitled to any compensation for performing the ordinary duties of his office unless a contract to that effect is made with him by its governing body. A contract may, however, be implied on the part of the corporation to pay its president for special services rendered outside of the ordinary duties of the office. The question whether or not there was an implied contract to this effect is one of fact, rather than of law. In considering whether or not such a contract has been proved, the nature of the corporation and its business, the nature and extent of the services rendered, the comparative amount and value of the services of other officers of the corporation, and all other circumstances of the case, must necessarily be looked at and weighed, and it must also be considered whether or not the services were performed under circumstances showing that it was understood by the proper officials of the corporation and by the officer rendering the services that they were to be paid for. 7 Thompson on Corporations, § § 8581, 8582; 21 Am. & Eng. Ency. Law, p. 909; 10 Cyc. 322; *Bartlett* v. *Mystic River Corporation,* 151 Mass. 433; *Corinne Mill Canal & Stock Co.* v. *Toponce,* 152 U. S. 405.

In the case at bar there were only a few members of the corporation, and all of them were its officers. All of them were rendering some character of service and doing some act to advance and promote the enterprise owned by the company. Some of the officers other than Powell rendered valuable services for the corporation, and asked and received no compensation therefor. It rather appears from the testimony and circumstances that no officer was expected to charge or receive any compensation for such services. The services rendered by Powell consisted in superintending the agents selected by him to make the sale of the lots. The testimony tends to prove that the officers of the corporation understood that all the expenses incident to making the sale of the lots under the plan suggested by Powell were to be paid on the commission basis, and that there would be no extra compensation paid to any officer for any services rendered in promoting or making the sale. The amount of the commission he was allowed by the chancellor for these expenses aggregated thirty per cent. of the gross proceeds of the sales, and, as found by the chancellor (which finding is sustained by the evidence), this was reasonably sufficient to pay for all expenses, expenditures and services in making said sales. Under these circumstances, we cannot say that the lower court erred in finding that there was no implied contract to pay Powell for his alleged services. The finding of the chancellor relative thereto should, therefore, not be disturbed.

5. In his findings the chancellor charged Powell with interest upon the final balance, which it decided was due by him, from November 23, 1905, the day upon which the lots were sold under the plan proposed by him. In this ruling we think that the chancellor was in error. The sale of the lots and the collection of the purchase money therefor by Powell was made with the consent and concurrence of all the directors. Although he was not the treasurer of the company, nevertheless the other directors of the corporation acquiesced in his being the custodian of these funds, and in his keeping them on deposit in a bank in St. Louis, which he did. He would not be chargeable with interest on funds which he was only holding as custodian thereof. There is no testimony that he used any of these funds, except the amount appropriated by him in payment of his notes to the Bank of Aurora. For the money of the company so used

by him he should be charged with interest, and for none other. 1 Perry on Trusts, § 468; 31 Cyc. 147; *Hinckley* v. *Rd. Co.,* 100 U. S. 153; *Howard* v. *Manning,* 65 Ark. 122. And he should be charged with interest on the funds so used by him only up to the time when he in effect replaced them, which could not be later than October, 1906. In October, 1906, Powell presented his account of all collections and disbursements made by him, and all the funds which then belonged to the corporation in his custody were on deposit in the bank in St. Louis. A controversy then arose between the parties as to the amount that should be allowed him for his expenses, and this controversy finally resulted in this litigation. But during all the time from that date Powell has only been the custodian of the funds of the corporation. There is no testimony showing that all the funds have not been and have not remained in the bank since October, 1906; there is no testimony that Powell has used any of these funds since that date for his individual purposes. This litigation simply determines what portion of the funds thus in the hands of Powell as the custodian of the corporation shall be retained by him for his expenses, etc., and what portion thereof shall be paid over to the corporation for distribution among the shareholders. Until this is finally determined and Powell ordered by the court to pay the moneys over, he should not be charged with interest thereon.

6. The plaintiffs in their complaint sought to obtain an allowance for an attorney's fee for the prosecution of this suit. The defendants also sought credit for an attorney's fee paid by them, as they claim, for the benefit of the corporation in defense of this suit, to which it was made a party. The lower court refused to make any allowance for attorney's fees to either party, and we think it was right in thus ruling. This suit was instituted for the purpose, in part, of recovering assets of the corporation; but, under the view taken by this court of this case, it can only result in a settlement of the accounts of the various officers and shareholders with the corporation. Each of the parties to this suit had an account with the corporation, and the result of this litigation is to adjust those accounts. As to his own individual account, each party is an adversary in the suit, not only to the other shareholders but also to the corporation. As to such account,

each party is endeavoring to lessen the amount due from him, and as to the accounts of the other parties he is endeavoring to enlarge them.  The subject-matter of the suit in its result involves the individual rights and interests of each party, and does not in effect involve those of the corporation.  Each party should, therefore, pay the fees of his own attorneys, and neither party should be given an allowance for such purpose.

It follows from the foregoing that the decree of the chancery court must be reversed.  But from such portions of the findings of the lower court which we have approved, and from the evidence which we have endeavored to carefully examine, we think that a just and equitable statement of the accounts of the parties can be made in accordance with the principles announced in this opinion.  We will make the statement of these accounts, and the cause will be remanded with directions to enter a decree in accordance herewith.

The shareholders of the Red Bud Realty Company consist of J. C. South, Thomas Combs, L. L. Doyle, R. X. DeGraw, W. V. Powell and Frank Tuttle, each of whom is the owner of 400 shares of the capital stock of the corporation, except W. V. Powell, who is the owner of 399 shares, and Frank Tuttle, who is the owner of one share.  The following is a statement of the funds belonging to the corporation and the sources from which they are derived:

Amounts received by W. V. Powell:

From sale of 808 lots at $50 per lot...............$40,400.00

From Thomas Combs on printing, supplies, etc.....   1,250.25

Amount of interest on money used in payment of notes to Bank of Aurora:

On $1,500 from Feb. 25, '05, to Oct. 15, '06,
        at 6 per cent....................$147.50

On $1,500 from Mar. 25, '05, to Oct. 15, '06,
        at 6 per cent.....................  140.00

On $2,200 from Apr. 18, '05, to Oct. 15, '06,
        at 6 per cent......................  198.00        $485.50
                                                        —————————

Total funds received by W. V. Powell........$42,135.75

Credits to which Powell is entitled in his account with the corporation:

Expenses in sale of 808 lots at $15 per lot........$12,120.00
Cash refunded on lots............................  1,385.00
Cash paid for printing plant and supplies..........   994.75

Total credits ...............................$14,499.75
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Total debits of Powell.......................$42,135.75
Total credits of Powell...................... 14,499.75

Balance due by Powell to corporation..........$27,636.00
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Account of Thomas Combs with the Red Bud Realty Company:

Amount received by Thomas Combs from sale of
lots, rents, etc ...........................$20,063.82
Credits:

Expenses, expenditures and salary.......$9,409.96
Cash for land to self................... 3,000.00   12,409.96

Balance due by Combs to corporation..........$ 7,653.86
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Statement of net funds belonging to corporation:
Funds due from Powell, as per above..............$27,636.00
Funds due from Combs, as per above..............  7,653.86

Total funds of corporation...................$35,289.86
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Statement showing net amount due by W. V. Powell to corporation, payments having heretofore been made to shareholders as follows:

Net funds in hands of Powell...................$27,636.00
Amount heretofore paid to South....$1,120.00
Amount heretofore paid to Combs.... 2,020.00   3,140.00

Net amount due from Powell for shareholders......$24,496.00
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Statement showing net amount due by Thomas Combs to corporation; payments having heretofore been made to shareholders as follows:

Net funds in hands of Combs.....................$7,653.86

    Amount heretofore paid to Powell....$300.00

    Amount heretofore paid to assignor of

        Doyle ......................... 300.00

    Amount heretofore paid to assignor of

        DeGraw ...................... 300.00

    Amount heretofore paid to South......3,040.00

    Amount heretofore paid to Thos. Combs 300.00    4,240.00

Net amount due from Combs for shareholders......$3,413.86

    Statement of various amounts due from corporation to the shareholders:

    W. V. Powell:

His 399-2000 share in net funds, as per above........$7,040.33

Less amount received from Combs............... 300.00

Net amount due W. V. Powell from corporation....$6,740.33

    J. C. South:

His one-fifth share in net funds, as per above......$7,057.97

    Less am't rec'd from Powell, as above..$1,120.00

    Less am't rec'd from Combs, as above.. 3,040.00    4,160.00

Net amount due J. C. South from corporation......$2,897.97

    Thomas Combs:

His one-fifth share in net funds, as per above........$7,057.97

    Less amount received from Powell....$2,020.00

    Less cash from self................. 300.00

    Less amount now in hands belonging to

        corporation ...... .............. 3,413.86   5,733.86

                            $1,324.11

    R. X. DeGraw:

His one-fifth share in net funds, as per above........$7,057.97

Less amount received by assignor, as per above...... 300.00

                            $6,757.97

L. L. Doyle:

His one-fifth share in net funds, as per above........$7,057.97
Less amount received by assignor as per above......    300.00

Net amount due L. L. Doyle from corporation......$6,757.97

    Frank Tuttle:

His 1-2000 share in net funds, as per above........$    17.64

    Summary of net amounts due each shareholder from funds
of corporation:

    To W. V. Powell....................$6,740.33
    To J. C. South...................... 2,897.97
    To Thomas Combs.................. 1,324.11
    To R. X. DeGraw .................. 6,757.97
    To L. L. Doyle .................... 6,757.97
    To Frank Tuttle .................    17.64

    Total  ....  ...................$24,495.99

    And the above will be paid out of said funds in hands of
W. V. Powell, amounting to $24,496.

    It appears from the testimony that after the alleged direc-
tors' meeting, held at Little Rock, Arkansas, in October, 1906,
W. V. Powell paid to R. X. DeGraw and L. L. Doyle certain
dividends. The amounts thus actually paid to them by Powell
should be deducted from the above balances found due to them,
and the remainder only should be paid to them, and the amount
payable by Powell to the corporation should be reduced by the
amounts so paid by him to DeGraw and Doyle after said meeting
of October, 1906.

    The shares of stock of Powell, Doyle and DeGraw were
in effect pledged to pay all indebtedness due by Powell to the
corporation, and were primarily pledged to secure the distribu-
tive portions of that indebtedness which were payable to South
and to Combs. Doyle and DeGraw have by their acts and con-
duct assented to this, and therefore they and Powell must be
postponed and paid after South and Combs have received their
distributive shares. A lien will be declared upon the shares of
stock of Powell, Doyle and DeGraw for the payment of the funds
due by Powell to the corporation, and the distributive shares of

South and Combs will be first paid out of the proceeds of the collection of said funds.

HART, J., dissents.