ROSE THEATER, INC. *v.* JONES.

157                                   278 S. W. 2d 105

Opinion delivered April 4, 1955.

[Rehearing denied May 16, 1955.]

952

*Lasley, Spitzberg, Mitchell & Hayes,* for appellant.

*Wright, Harrison, Lindsey & Upton,* for appellee.

ROBINSON, J. This is a suit to require the one who organized a corporation to return to the company shares of stock alleged to be of a value in excess of the value of land traded to the corporation for stock; to dissolve the corporation, sell the assets, and distribute the proceeds of the sale among the stockholders.

R. M. Traylor controls the Arkansas Real Estate Company which owned 16½ acres on East Roosevelt Road in the city of Little Rock. He wanted to construct a theater on this land, and organized for that purpose a corporation, appellant herein, Rose Theater, Inc. That corporation, owning no assets, issued to the Arkansas Real Estate Company 100,000 shares of common stock in payment of the tract of land above mentioned. The common stock was of no par value; hence the 100,000 shares of stock issued in payment of the land were worth whatever the land was worth.

Traylor was inexperienced in the operation of theaters, and sought advice from appellee Gerald W. Jones, an experienced theater man who was operating several picture shows at the time. Later Jones decided to come

into the venture with Traylor under an agreement whereby Jones would be the manager of the theater. Later Jones and William Van White, another stockholder, brought this action in behalf of themselves and other stockholders.

It is alleged that $65,000 has been spent on the land getting it in shape for a theater, $38,000 for buildings, and $6,000 for theater equipment; that $123,000 would be required to complete the theater and put it in operation and there is evidence to the effect that in fact about $180,000 would be required for that purpose. It is contended that the corporation is without funds and can not raise the necessary money to complete the project; that the part which has been built is depreciating in value and will eventually become worthless; that Traylor through his corporation, Arkansas Real Estate Company, defrauded the Rose Theater by false representations as to ownership of part of the land involved, and by falsely representing that the land had a fair market value of $65,000. After a trial of the issues, the trial court entered a decree ordering the assets of Rose Theater sold.

One of the principal issues is whether Traylor perpetrated a fraud upon Rose Theater in causing the Arkansas Real Estate Company to convey to Rose Theater the land for a price in excess of the true value. The evidence does not justify a conclusion that any fraud was perpetrated in this repect. Assuming that Traylor controls the Arkansas Real Estate Company, we will refer to dealings by that company henceforth as Traylor's.

At the time Traylor acquired 100,000 shares of no par value common stock of Rose Theater, that corporation owned no assets whatever other than the land that it received for the 100,000 shares of stock. Therefore, regardless of any kind of representations made in connection with the value of the land, the Rose Theater could not have been hurt. It gave nothing for the land except the common stock of no par value; the stock was not worth anything above what the land was worth. So re-

gardless of whether the land was worth $10 or $10,000 an acre, Rose Theater got full value for the stock it gave as the purchase price of the land. Appellees contend that Traylor did not own in fee all of the land transferred to the theater that was to be used for theater purposes, that $6,000 was owed on that which he did own, and that he only had leases on a portion of it. But assuming this to be true, still the common stock issued to Traylor had no value other than what the land was worth which Traylor transferred to the theater, regardless of what that value might be.

After Jones came into the corporation, he complained to Traylor that the preferred stock could not be sold without giving the purchaser an opportunity also to buy some common stock, and since Traylor held all the common stock, sale of the preferred was very difficult. Traylor then transferred back to the corporation 15,000 shares of the common stock, permitting it to be sold elsewhere. The corporation was authorized to issue 1,500 shares of 8% non-participating preferred stock having a par value of $100 per share. Jones has purchased 733 shares of preferred stock for $73,300; this was bought from the corporation, the money paid into the corporation and spent under the supervision of Jones. Jones bought $38,400 worth of common stock and claims that he was overreached by Traylor in the trade on that stock; however, they dealt at arm's length. Jones says that Traylor represented to him that the land owned by Rose Theater was worth $65,000 and that acting on this representation he bought common stock from Traylor at $.65 a share. Jones is an experienced business man; he had every opportunity to ascertain the value of the land owned by the theater. Later, after Jones had been in active management of the affairs of the corporation for some time, a par value of $1 per share was set on the stock, but this was at Jones' suggestion.

A great deal more money was spent on the project than was anticipated at first; but this was mostly due to Jones' management of the affairs of the corpo-

ration. In the first place, it cost a good deal more to prepare the land for the theater than was planned. Traylor had nothing to do with estimating this job; it was done by engineers selected by Jones and the contractor, and they underestimated the cost of the project. Jones is to be commended that he did not hold the contractor to a bad bargain, but the mistake should not be charged to Traylor. Two screens were built at a cost of $38,000 when only one screen had been planned originally; this change in plans was due solely to Jones who, while on a trip to Texas, came to the conclusion that two screens would be better. It appears that all of the money which has been spent in connection with the project has been under the management and supervision of Jones.

It is claimed that the corporation is financially embarrassed, and can not raise the money to proceed with the completion of the theater; but there is no showing that any effort has been made to raise the money to complete the job. It appears that about the only thing Traylor has done in connection with this theater is to organize the corporation and transfer to it 16½ acres of land and some leases in consideration of 100,000 shares of the common stock of the corporation. At that time the corporation had no assets except the land. Later Traylor sold some of his stock to Jones, and even if Traylor represented the stock as being worth $.65 a share because the land he had transferred to the theater was worth $65,000, this would not be a false representation giving rise to a cause of action. Traylor was dealing with a man of experience at arm's length, and the value of the land was a matter of opinion. Witnesses at the trial estimated its value at anywhere from $15,600 to $75,000.

If the decree is allowed to stand, it will mean that all the assets of the theater will be sold to the highest bidder; the money received will be used first to pay off any third party debts, and from the record there does not appear to be any of that kind of any consequence; next the preferred stockholders will be paid insofar as the money received will go toward the payment of the stock at the

par value of $100 per share plus 8% accumulated dividends. In all probability the assets will not bring enough whereby the owners of the common stock will be paid anything.

Appellees also contend that a decree providing for dissolution of a corporation in the circumstances existing here is supported by the case of *Warner* v. *Bonds,* 11 Ark. 238, 163 S. W. 788. There it was held that a minority stockholder may maintain an action for fraud and mismanagement against the governing body of the corporation. This rule is also supported by *Red Bud Realty Co.* v. *South,* 96 Ark. 281, 131 S. W. 340. But the facts as they existed in those cases are not present here. In the case at bar, the largest stockholder is the one that has managed the affairs of the corporation and is the principal one who seeks dissolution.

Appellees also cite authority to the effect that a stockholder may maintain a dissolution suit when the object of the corporation is no longer attainable; but we can not say the evidence here justifies such a conclusion. The corporation owes no debts of any consequence; preferred stockholders are not creditors. 13 Am. Jur. 466. Traylor and those on his side do not own the controlling stock. The corporation owns over 16 acres in fee and leases on other acres making a total of 23 acres controlled within the city limits of Little Rock; $65,000 has been spent in preparing the land for use as an outdoor theater; $38,000 has been spent in building two large moving picture screens; and $6,000 has been spent on equipment. It appears from all this that the corporation should be able to finance the completion of the theater. At least we do not believe the evidence justifies a holding that the corporation cannot proceed with its business and put an outdoor theater into operation. Perhaps all parties concerned have not proceeded with the caution that prudence would dictate, but be that as it may, there does not appear to have been any fraud, and the object of the corporation does not appear to be unattainable.

Reversed.

Justices McFADDIN and WARD dissent.

ED. F. McFADDIN, Justice, dissenting. I would affirm the Chancellor's decree dissolving the corporation. The evidence clearly shows that the corporation has failed of its purpose and that inevitable ruin will result from continued existence.

Bypassing all matters of (a) fraud, (b) value of the land and (c) the preferred stock as a *debt* in order to make the corporation insolvent, we are nevertheless face to face with the hard fact that this corporation has never functioned and never can function if the present impasse continues. There is no evidence that a love-feast will ever take place between the rival factions. In such a situation the Chancery Court decreed that the assets should be sold, the debts paid, and the balance distributed to the stockholders. The majority opinion of this Court in reversing the Chancellor concludes with this language:

"At least we do not believe the evidence justifies a holding that the corporation cannot proceed with its business and put an out-door theater into operation. Perhaps all parties concerned have not proceeded with the caution that prudence would dictate but, be that as it may, there does not appear to have been any fraud, and the object of the corporation does not appear to be unattainable."

I maintain that the corporation has failed of its purpose and that inevitable ruin will result from continued existence. Notice these dates and events:

(1) The corporation was organized in June, 1952, and Mr. Traylor received all of the common stock (100,000 shares of no par value stock) for the land.

(2) In July, 1952, Mr. Traylor went to Mr. Jones and asked if he would be interested in becoming associated with the corporation; and on July 23, 1952, the corporation entered into a contract with Mr. Jones which provided, *inter alias*:

''The Company and Jones agree that Jones shall be the exclusive managing director of the Company for the period of five (5) years from the date of the opening of the Drive-In Theater of the Company, which shall be known as the Rose Drive-In Theater ... For his services to be performed under this management contract the Company will pay Jones 4% of the net gross of dollar volume done by the Company . . .''

Notice that Jones was not to be the manager until the operations commenced; so during all the time involved in this litigation Jones was only a director along with the two Traylors, and the Traylors constituted a majority of the Board.

(3) Jones started buying preferred and common stock in the corporation so that at the time of the trial Jones had $74,400.00 of preferred stock and 38,400 shares of common stock. At the time of the trial the total of preferred stock was $127,500.00 and the total of common stock was 100,000 shares.

(4) The Traylors and their Company, Arkansas Real Estate Company, had altogether only $3,000.00 invested in preferred stock and a total of 49,100 shares of common stock. Jones and his associates had put up a great majority of the cash invested in the preferred stock whereas Traylor and his company owned almost 50% of the common stock.

(5) Jones tried unsuccessfully to get Traylor to buy for himself, or to sell to others, the preferred stock in amounts equal to Jones' preferred stock so that the corporation would have money with which to complete its building program.

(6) By February, 1953, the corporation was out of money; and the record shows that it would cost at least $123,500.00 to complete the building program and put the theater into operation.

(7) Matters rocked along from February to May, 1953, with Traylor neither buying any of the preferred stock himself nor selling any to his friends: so that on

May 21, 1953, Jones filed this suit to have the corporation dissolved, its assets sold and the proceeds distributed.

(8) The decree was rendered on June 22, 1954, more than one year after the suit was filed; and Traylor superseded the decree so that matters still remain at a standstill. Thus more than two years have passed since February, 1953, when the corporation ran out of money; and nearly two years have passed since the suit was filed; and yet the majority opinion says that ''the object of the corporation does not appear to be unattainable.''

The effect of the majority opinion is to say to the litigants: 'We leave you where we find you: work out your own salvation between yourselves or both perish'. I do not believe that a court of equity should treat litigants in this manner when neither side has been guilty of fraud and the only fault is that the parties are unable to accomplish the purpose for which the corporation was organized. There is ample precedent to support the decree rendered by the Chancery Court.

In 43 A. L. R. 305 there is an Annotation on the inherent power of a court of equity at the instance of a stockholder to wind up a corporation when it is made to appear that there is a failure of the corporate pur-. pose and inevitable ruin will result from continued existence. The holdings are summarized in this language:

''There are a number of decisions which support, by their holdings or at least by their recognition of the rule, the doctrine that a court of equity may wind up the affairs of a solvent corporation at the instance of a stockholder, and for that purpose appoint a receiver, if it has become impossible for the corporation to fulfill the purposes of its creation, or inevitable ruin will result from continued operation. In some of these cases, as will be observed from the statement of the decisions below, the corporation had ceased to be a going concern, and the doctrine possibly originated in this class of cases. But it has been recognized in some cases where the cor-

poration had not apparently entirely ceased to be a going concern.''

To sustain the text cases are cited from Alabama, Kentucky, Maine, Michigan, Minnesota, New Jersey, Tennessee and the Federal Courts. In 61 A. L. R. 1223 and again in 91 A. L. R. 679 the Annotation is extended and cases are cited from the additional States of Pennsylvania, Indiana and Nebraska, as well as from other Federal Courts.

Then in 13 A. L. R. 2d 1260 there is an Annotation entitled: ''Dissolution of corporation on the ground of intra-corporate deadlock or dissension''; and on page 1263 in discussing circumstances authorizing dissolution the holdings are summarized in this language:

''The view that a court of equity has the power to order dissolution of a corporation which is practically paralyzed in the use of its corporate functions or can no longer operate to the advantage of the stockholders as a whole, because of dissension prevailing between opposing factions of stockholders, at least where such a measure is the only adequate relief available, finds support in the following cases: . . .''

Cases from Alabama, Delaware, Kansas, Kentucky, Michigan, Minnesota, Oklahoma, Pennsylvania, Tennessee and Texas are cited to support the last quoted statement.

In 4 Ark. Law Review 228 there is a case note entitled: ''Corporations — Internal Dissension as a Ground for Equity Appointing a Receiver for a Solvent Corporation.'' After listing and discussing cases from many jurisdictions, the conclusion is stated in this language:

''No case has been found in Arkansas in which the general power of equity to appoint a receiver for a going, solvent corporation has been considered. The State's corporation law makes no provision for receivership except in cases of insolvency. Ark. Stats. (1947) § 64-802. But the absence of affirmative statutory

authorization does not necessarily rule out the possibility of such proceedings in Arkansas based on the inherent power of equity, as demonstrated by many of the foreign decisions discussed herein.''

The majority opinion entirely ignores the basis on which I think the Chancery decree should be affirmed. The evidence here clearly shows that the corporation has failed of its purpose and inevitable ruin will result. Therefore equity should act just as the Chancellor decreed.