## BACKUS et al. v. FINKELSTEIN et al.

District Court, D. Minnesota, Fourth Division. November 19, 1927.

**1. Corporations ⬳310(1)—Managing officers of corporation are held to high degree of diligence and good faith.**

Managing officers of corporation are held to high degree of diligence and good faith, since stockholders as such cannot participate in shaping corporation's policies, or directing its activities from day to day, but are obliged to look to and rely on managing officers, who represent and act for all stockholders.

**2. Corporations ⬳307—Corporate officers, controlling its activities through ownership of majority of stock, occupy fiduciary relation to minority stockholders.**

Officers of a corporation, who, through the ownership of majority of stock, control its activities, occupy a fiduciary relation to minority stockholders, and at their peril must act in strictest good faith in guarding interests of the latter.

**3. Corporations ⬳308(1)—Conduct of managing officers of corporation held such as to preclude allowance of salaries.**

Conduct of managing officers of corporation in managing its affairs *held* such as to preclude allowance of salaries in connection with services claimed to have been rendered.

**4. Trusts ⬳315(1)—Person acting in fiduciary capacity in good faith and for interests of beneficiary is entitled to compensation for services.**

Any person acting in fiduciary capacity is entitled to compensation for his services, when he acts in good faith and for the best interests of his beneficiary in diligently guarding and advancing interests of the latter.

**5. Corporations ⬳308(1)—Managing officer of corporation, not acting in good faith, is not entitled to compensation for services.**

Fiduciaries acting as managing officers of corporation *held* not entitled to compensation for services, when not acting in good faith and

for best interests of beneficiary in diligently guarding and advancing his interests.

**6. Corporations ⊜314(2)—Imposing debt and mortgage on corporation for use and benefit of managing officers held unwarranted use of corporate credit.**

Imposition of debt and mortgage on corporation by managing officers for their sole use and benefit *held* an unwarranted use of corporate credit.

**7. Corporations ⊜317(5)—Corporation, in effect paying for stock of managing officers imposing debt and mortgage on corporation, is entitled to cancellation.**

Where corporation in effect paid for stock purchased with money secured by managing officers by imposing debt and mortgage on corporation, it is entitled to have stock so paid for canceled, and to recover all dividends received thereon.

**8. Trusts ⊜231(1)—Plenary relief may be granted in case fiduciary uses property of cestui que trust for personal advantage.**

In all cases where a fiduciary for his own personal advantage uses property of cestui que trust, plenary relief may be granted.

**9. Corporations ⊜314(2)—Profits accruing to managing agent using credit of corporation belong to corporation.**

Where credit of a corporation is used for benefit of individual managing agent thereof, all profits belong to corporation.

**10. Corporations ⊜317(5)—Stock purchased by managing officers through use of corporate funds will be canceled.**

Any stock of corporation purchased by managing officers through use of corporate funds will be canceled, except in so far as stock, through rescission of sale, is restored to original owners.

**11. Corporations ⊜477(1)—Mortgage clause covenanting that corporation controlled by mortgagors would not dispose of property held of no force.**

Clause in mortgage executed by corporations owning majority of stock of another corporation, whereby they agreed to refrain from assigning, incumbering, or otherwise disposing of leasehold estates belonging to it, *held* of no binding force or effect.

**12. Corporations ⊜317(5)—Conduct of managing corporate officers during period they acquired large amount of stock held to evidence scheme justifying rescission of stock sales.**

Conduct of managing officers of corporation during period of acquiring stock from number of minority stockholders *held* to evidence a far-reaching scheme for acquiring outstanding stock in disregard of rights of minority stockholders, to extent that minority stockholders were entitled to rescission of sales.

**13. Corporations ⊜311—Managing officers of corporation must accurately keep and preserve accounts and records (Gen. St. Minn. 1923, § 7470; Rev. Code S. D. 1919, §§ 8830–8832).**

Under Gen. St. Minn. 1923, § 7470, and Rev. Code S. D. 1919, §§ 8830–8832, managing officers of corporation, in dealing with property and rights of others, must accurately keep and preserve accounts and records.

**14. Corporations ⊜117—Stockholders, on rescission of sale of stock, are entitled to dividends, with interest, after deducting amount paid for stock.**

Rescission of sales of corporate stock carries with it right of former stockholders to recover from purchaser all moneys received as dividends on stock, with interest from date dividends were paid, after deducting amounts paid for stock, with interest from date of payment.

**15. Partnership ⊜241—Purchaser of interest in partnership, permitting partnership to wrongfully acquire corporate stock in corporation controlled by it, held bound thereby.**

Purchaser of interest in partnership, by conduct in allowing partnership to wrongfully acquire stock in corporation which it controlled, adopted and ratified such conduct, and is necessarily bound thereby to same extent as other partners.

**16. Partnership ⊜241—Purchaser of interest in partnership during mismanagement of corporate affairs controlled by partnership held liable therefor.**

Where purchaser of interest in partnership acquired interest during period of mismanagement of corporation by such partnership, he is liable together with other members on rescission of sales of stock resulting from such wrongful acts, since he was bound to acquaint himself with affairs of partnership at time of purchase of interest.

**17. Partnership ⊜234—Purchaser of interest in partnership takes only that which partners can transfer.**

Purchaser of interest in copartnership takes that only which partners could transfer to him, and stands in their shoes with respect to affairs at time of purchase.

**18. Corporations ⊜665(3)—Relief which may be granted domestic corporations may also be granted foreign corporations having property and officers within court's jurisdiction.**

Relief which may be granted domestic corporations in exercise of general equity powers of court may also be granted to foreign corporations, where property and officers of corporation are within jurisdiction of court.

**19. Corporations ⊜684—General receiver may be appointed for foreign corporation with property and officers within court's jurisdiction.**

Federal court has jurisdiction to appoint a general receiver for foreign corporation having property and officers within jurisdiction of court.

In Equity. Suit by H. N. Backus and others against M. L. Finkelstein and others. Decree in accordance with opinion.

Harrison E. Fryberger, of Minneapolis, Minn., and Leslie H. Morse, of Mankato, Minn., for plaintiffs.

Doherty, Rumble, Bunn & Butler, of St. Paul, Minn., for defendants.

CANT, District Judge. Since about January 1, 1915, except as hereinafter set forth, the defendants Finkelstein and Ruben, through ownership or control of a majority of the stock, have been in complete control of the management of the Miles Theater Company, a South Dakota corporation, which during all of said time has been operating a moving picture theater at Minneapolis, Minn. This theater was first known as the Miles Theater, and later as the New Garrick. On April 28, 1918, the defendant Hamm, through contract with the other individual defendants above named, acquired an interest in said Miles Theater Company, and in other organizations and property controlled by said individual defendants. Except as otherwise appears from the context, the word "defendants," when used herein, shall be deemed to refer to the three individual defendants above named. In 1920, this suit was begun by certain stockholders in said Miles Theater Company, hereinafter referred to as the corporation, and by certain others who claimed that they had been stockholders therein and that they had been induced to sell their stock through the fraud and misrepresentation of defendants.

Since the institution of the suit, various other persons claiming to be in the same class last above referred to, have been allowed to intervene therein. All those who are plaintiffs or interveners claim that defendants have grossly violated their duties as managing agents of the corporation, and that, while defendants have profited greatly thereby, the corporation and the minority stockholders have suffered grievous losses in consequence thereof. For alleged wrongs against the corporation, and losses suffered thereby, plaintiffs and interveners pray a recovery on its behalf. On account of the alleged fraud and misrepresentations whereby certain of the plaintiffs and interveners were induced to sell their stock, such parties pray that such sales be rescinded, and that they be restored to their respective positions as stockholders in said corporation.

1. The cause of action on behalf of the corporation was submitted to Hon. Wilbur F. Booth, while he was a judge of this court. 23 F.(2d) 531. Judge Booth determined conditionally that there should be a recovery on behalf of the corporation. Certain questions were definitely and finally passed upon by him and certain others were left for determination later on. By interlocutory decree the defendants were required to account with respect to various of the charges made against them on behalf of the corporation,

and the matter was submitted to Special Master H. D. Irwin for the purpose of taking such accounting and reporting to the court his findings with reference thereto. Pursuant to such reference, evidence was taken at length on such accounting and the special master thereupon filed his report in such matter. Both plaintiffs and defendants filed exceptions to the report of the special master. Such exceptions, in part, have already been disposed of.

It is now ordered that the exceptions so filed, and each of them, be and they hereby are overruled, and that such report and findings be and they hereby are adopted and confirmed. This report, in large measure, affirms the claims of wrongdoing made on behalf of the corporation. The charges relating to the mortgage of $52,000 made by the corporation in 1914, and those relating to the mortgage of $250,000 made by certain other corporations, controlled by defendants Finkelstein and Ruben, in 1916, as well also as certain other matters of importance in the case, are not covered thereby. In view of the strict presumptions against defendants, which, as a matter of law, necessarily arose from the evidence, the report of the master was much more favorable to them than it might have been if the master had more fully indulged such presumptions. However, upon consideration of all thereof, the court has concluded to approve the report as made.

It is possible that defendants had no accurate knowledge or clear conception of their duties, or of what the law required of them as managing officers and owners of the majority of the stock in the corporation in question. It is at least charitable to take this view, and it may be according to the fact. It is not difficult to understand how in a somewhat vague and blind way they may have reasoned that such success as attended the corporation was largely due to their individual efforts, and therefore that they should reap the reward to the exclusion of all other persons. This may explain their course, but it fails entirely to justify or excuse. By their own conduct defendants, in large measure, have overwhelmed themselves, and they are not in a position to complain of the consequences which necessarily must follow. Neblett v. MacFarland, 92 U. S. 101, 105, 23 L. Ed. 471. [1, 2] 2. The rules applicable in such cases exact from those in control a high degree of diligence and good faith. The stockholders of a corporation, as such, cannot participate in shaping its policies or directing its activities from day to day. They are obliged to look to and rely upon the managing officers,

who in theory of law, and as a matter of fact, represent and act for all the stockholders. Officers of a corporation, who through the ownership of a majority of the stock control its activities, occupy a fiduciary relation to the minority stockholders, and at their peril must act in the strictest good faith in guarding the interests of the latter.

"Such a majority of the holders of stock owe to the minority the duty to exercise good faith, care, and diligence to make the property of the corporation in their charge produce the largest possible amount, to protect the interests of the holders of the minority of the stock, and to secure and deliver to them their just proportion of the income and of the proceeds of the property. Any sale of the corporate property to themselves, any disposition by them of the corporation or of its property, to deprive the minority holders of their just share of it, or to get gain for themselves at the expense of the holders of the minority of the stock, becomes a breach of duty and of trust which invokes plenary relief from a court of chancery." Jones v. Missouri-Edison Electric Co. (C. C. A.) 144 F. 765, 771. See, also, Wheeler v. Abilene National Bank Building Co. (C. C. A.) 159 F. 391, 394, 16 L. R. A. (N. S.) 892, 14 Ann. Cas. 917.

"Directors and officers of corporations occupy a position of trust and must act in the utmost good faith. They will not be allowed to deal with the corporate funds and property for their private gain. They have no right to deal with themselves and for the corporation at the same time, and they must account for the profits made by the use of the company's assets, and for moneys made by a breach of trust." McCourt v. Singers-Bigger (C. C. A.) 145 F. 103, 107 (7 Ann. Cas. 287), quoting from Ward v. Davidson, 89 Mo. 445, 458, 1 S. W. 846.

"That a director of a joint-stock corporation occupies one of those fiduciary relations where his dealings with the subject-matter of his trust or agency, and with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others." Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 588, 589 (23 L. Ed. 328); Miner v. Ice Co., 93 Mich. 97, 109, 53 N. W. 218, 17 L. R. A. 412.

"The officers of a corporation are charged in the performance of their duties with certain obligations of trust and confidence to all the stockholders thereof without discrimination, to be performed with fidelity, and any intentional deviation or departure therefrom, to the substantial injury of any of the stockholders, constitutes willful mismanagement as a matter of law, for which a court of equity has jurisdiction to call them to account." Green v. National Advertising & Amusement Co. et al., 137 Minn. 65, 162 N. W. 1056, L. R. A. 1917E, 784 (Syllabus—by the court).

"The law requires of the majority the utmost good faith in the control and management of the corporation as to the minority. It is of the essence of this trust that it shall be so managed as to produce for each stockholder the best possible return for his investment." Dill v. Johnston, 72 Okl. 149, 152, 179 P. 608, 610, quoting from Miner v. Ice Co., 93 Mich. 97, 53 N. W. 218, 17 L. R. A. 412. See, also, Jones v. Morrison, 31 Minn. 140, 148, 16 N. W. 854; Shearer v. Barnes, 118 Minn. 179, 136 N. W. 861.

3. The foregoing fundamental rules speak in unmistakable terms and are applicable throughout this case. It is clear that they go quite beyond any standards recognized by the defendants here. At first the defendants Finkelstein and Ruben, and later on those two and the defendant Hamm, all stood in the relation of fiduciaries to the plaintiffs and interveners here. How distressingly far some or all of them wandered from the path of duty in such relation may be seen from an inspection of the master's report and from the further considerations herein.

[3] 4. Among the questions left for determination at this time is whether the conduct of defendants in relation to the corporation has been such that salaries should or should not be allowed them in connection with the services which they claim to have rendered. In this connection a long and imposing list of derelictions of duty are pressed upon the consideration of the court:

(a) The scrappy and sketchy and quite inadequate records which were kept of business transactions, whereby no stockholder, without great expense and much labor, could ascertain anything about the financial condition of the corporation.

(b) The loss or destruction of many important records, which a proper regard for the rights of others required should be preserved.

(c) The unfair allocation of the cost of films as between the New Garrick and other theaters.

(d) Charging the New Garrick with films which were never shown there.

(e) The unfair charges made against the New Garrick on account of joint expense incurred in the operation of that and other theaters.

(f) The continued and frequent abstracting of large sums of money from the treasury of the corporation by defendants for use in their private ventures. This went on without abatement for a considerable period of time after defendants were warned thereof by the allegations of the complaint herein.

(g) The attempted absorption by defendants of excessive amounts allowed to themselves as salaries. According to the evidence this continued long after and in defiance of the decision of Judge Booth, to the effect that in any event such salaries must be much reduced.

(h) Using the credit of the corporation to the extent of $52,000, through the execution and delivery by the corporation of a mortgage in that amount, given to secure a debt which was really that of defendants Finkelstein and Ruben, and which, in truth, was not a debt of the corporation at all.

(i) Causing to be inserted in a mortgage of $250,000, executed in 1916 by the New Palace Theater Company, of Minneapolis, and the New Princess Theater Company, of St. Paul, corporations controlled by defendants Finkelstein and Ruben, and which owned a majority of the stock of the Miles Theater Company, a clause whereby such corporations covenanted "to cause the Miles Theater Company to refrain from assigning, incumbering, or otherwise disposing of the leasehold estates and property belonging to it as aforesaid," by which clause defendants Finkelstein and Ruben for the purpose of advancing their private interests, virtually assumed to bind themselves as managing officers of the Miles Theater Company, during the life of the mortgage last referred to, to refrain from incumbering or selling the property of that corporation, no matter what its interests might require. This clause was, at least, a reckless disregard of the interests of the corporation, and its tendency must have been to work a substantial damage thereto.

(j) The long course of alleged misconduct in connection with the purchase of stock from the minority stockholders, which will be referred to later in more detail.

These charges, and the wrongful design in connection with each, have all been fairly and fully established, in part by the evidence before Judge Booth and his decision, in part by the evidence before the special master and his findings, and in part by other

evidence of a satisfactory character before the court at the final hearing.

[4, 5] Any person acting in a fiduciary capacity is entitled to compensation for his services, when he acts in good faith and for the best interests of his beneficiary in diligently guarding and advancing the interests of the latter. Any variation from this necessary requirement carries with it a forfeiture of all compensation which otherwise might be due. This rule applies to fiduciaries acting as managing officers of a corporation, as well as to all others. Munro v. Smith (C. C. A.) 259 F. 1, 21; McKinley v. Williams (C. C. A.) 74 F. 94; Wadsworth v. Adams, 138 U. S. 380, 11 S. Ct. 303, 34 L. Ed. 984; Eaton v. Robinson, 19 R. I. 146, 31 A. 1058, 32 A. 339, 29 L. R. A. 100; Murray v. Beard et al., 102 N. Y. 505, 508, 7 N. E. 553; Venie v. Harriet State Bank, 146 Minn. 142, 145, 178 N. W. 170.

Under the circumstances established here, the operation of these rules effectually prevents the allowance of any salaries to Finkelstein and Ruben on account of services rendered. The rules are designed to insure faithful service by the imposition of adequate penalties in case of a violation thereof. They are wise and wholesome, and under the circumstances here no court could do otherwise than apply and enforce them.

As to the defendant Hamm, the wrongs complained of continued without abatement, and some of them were appreciably increased, after he became interested. Upon his advent in the organization, Mr. Hamm, so far as the evidence discloses, was not relegated to a position of minor importance. He had twice as large an interest as any other individual therein. What was done was done more for him and in his behalf than for any one else. So far as can be learned from the evidence, his time and energies were not taken up with the mechanical part of the enterprise, nor with matters of detail, to such an extent that he was shut off from a view of the larger aspects of what was going on. He and those immediately associated with him were concerned with the policies and the management of the organization.

In connection with that management, if he was to draw the generous salary which he did, he should have been zealously guarding the interests of the corporation. If, without protest, he allowed frequent raids upon its treasury, and if he failed to see, or ignored, other and serious wrongs which were being perpetrated before his eyes, he is not in a position to ask compensation for services in protecting the interests of the corporation.

Merely, in a general way, looking after his large investment in the enterprise, would entitle him to dividends, but would confer no right to any salary. The right, if any, to claim a salary would depend upon the rendering of substantial services to the corporation.

It is not a harsh, but a necessary, application of well-known rules which requires the court to hold that, under the circumstances here in hand, all salaries received by any of the defendants, with interest thereon, should be restored to the corporation, and should be paid to the person hereinafter specified, for its use.

[6] 5. The imposition of the debt and mortgage of $52,000 upon the corporation for the sole use and benefit of Finkelstein and Ruben was an unwarranted use of the corporate credit. It was the same, in effect, as if Finkelstein and Ruben had bought and paid for the majority of the stock in the corporation, and thereafter had used the credit of the corporation to raise the sum of $52,000 in money, and said money had been paid to them for use in their various private undertakings. In this case it stood in the place of and served for them as the equivalent of $52,000 in money, and gave them the possession and control of 8,922⅖₁ shares of stock in the corporation.

[7] In effect, the corporation paid for this stock. Under the circumstances the corporation is entitled to have canceled the stock so paid for and to recover all dividends received thereon, and defendants are entitled to credit for all sums paid by them or any of them in liquidation of such mortgage indebtedness and for interest thereon. Using the corporate credit in this way is essentially the same, in effect, as appropriating and using temporarily, or otherwise, the tangible property of the corporation.

The necessary effect of this mortgage was at once to depress the value of all the stock of the corporation. It had taken on a large indebtedness. Although the mortgage was executed before defendants Finkelstein and Ruben obtained full control of the corporation, it was all in the course of negotiations for obtaining such control, in which negotiations they had an active part, and was for their special benefit, although the negotiations were also for the benefit of Miles as well.

The way in which the property and rights of the corporation were made the convenient personal asset of defendants Finkelstein and Ruben is in part shown by the exhibits attached to the deposition of Daniel L. Bell, which was taken on July 21, 1922. In one of the exhibits, marked Exhibit A, and dated September 8, 1914, the said Bell, acting for Finkelstein and Ruben, assumed and agreed to pay the $52,000 mortgage against the property. This was the personal obligation of Finkelstein and Ruben, acting through Bell, to pay the debt of Miles, not the debt of the corporation. This was well known. Otherwise there would have been no occasion for the personal covenant in reference thereto. The fact, if such it was, that Miles wrongfully used the property of the corporation to further his personal ends does not excuse or make it less wrong for defendants Finkelstein and Ruben to do the same, nor does it affect their legal liability by reason thereof. Said defendants went further, however, and had the corporation itself undertake to pay the debt. In another exhibit, also marked A, attached to the same deposition, and dated November 23, 1924, the same thing is still more apparent, and the rights of all minority stockholders are quite disregarded.

The transaction comes within the rule announced in this circuit in the following language: "But a court of equity will hold such majority stockholder to the observance of the highest rectitude in dealing with the corporation, and, where the contract is unfair or unconscionable, where the consideration is inadequate, or where the contract is not for the best interests of the corporation, but subserves the selfish purpose of such stockholder, it will set aside such contract at the instance of the corporation or its minority stockholders." Heim v. Jobes (C. C. A.) 14 F.(2d) 29, 32.

[8, 9] In all cases where a fiduciary for his own personal advantage uses the property of his cestui que trust, plenary relief may be granted. The hands of the court are not tied. Whatever relief may be appropriate to the particular case will be meted out to the parties. Setting aside the transaction and requiring that an accounting of profits be made is a common form of relief. Jones v. Missouri-Edison Electric Co. (C. C. A.) 144 F. 765, 771 et seq., 780; McKinley v. Williams (C. C. A.) 74 F. 94; McCourt v. Singers-Bigger (C. C. A.) 145 F. 103, 107, 7 Ann. Cas. 287; Maas v. Lonstorf (C. C. A.) 194 F. 577, 584; Pepper v. Addicks (C. C.) 153 F. 383, 405. So, where the credit of a corporation is used for the benefit of an individual managing agent thereof, all profits belong to the corporation. Goodhue v. Davis, 81 Minn. 210, 83 N. W. 531. See, also, Gross Iron Ore Co. v. Paulle, 132 Minn. 160, 166, 156 N. W. 268.

The fact that defendants have paid this mortgage indebtedness, or some part thereof, is not important, except as bearing upon the amount of credit which they should be allowed on account thereof. The appropriation and use of the corporate credit by Finkelstein and Ruben were fully consummated. Said defendants had acquired stock which presumably they could not otherwise have obtained. If later on, at their convenience, they made good the amount for which the corporate credit was used, they did that which might have been required of them at any time. This did not erase the original wrong, nor in the least affect the rights of the plaintiffs and interveners to cancel, so far as possible, the wrongful use of the corporate credit, and to compel defendants Finkelstein and Ruben to account for the gains which they had realized therefrom.

It is not a matter of allowing them to pay interest until the amount for which the credit was used should be paid, nor of charging said defendants with profits realized during that period. The application of such a rule would be wholly inadequate to serve as a deterrent from the commission of such unauthorized acts. The amount for which an accounting should be had would be the same whether the payment by defendants had been promptly made, or had been long delayed. The only office of the payment is not to end the period which should be covered by the accounting of profits, but as a credit to the wrongdoer on such accounting.

[10] 6. In this immediate connection it should be noted that the agreement between Bell on the one hand and Finkelstein and Ruben on the other, was that, in part, at least, the latter were to repay Bell on their indebtedness to him and for the stock they acquired through him, by turning over to Bell from time to time the amounts they should receive as salary from the Miles Theater Company. This was, in fact, done throughout a certain period. Since Finkelstein and Ruben were not entitled to any salaries, the turning over of such moneys to Bell was a wrongful appropriation of the corporate funds, and the stock so paid for, to the extent that payments were so made, should be canceled. In like manner, all other stock purchased by defendants, or any of them, through the use of corporate funds, excepting only such stock as, through rescission of the sale thereof, shall be restored to the original owners, should be canceled.

[11] 7. Although not so intended, or understood at the time, the objectionable clause hereinbefore referred to in the $250,000 mortgage, was of no binding force or effect. Seitz v. Michel, 148 Minn. 80, 85, 181 N. W. 102, 12 A. L. R. 1060; Van Slyke v. Andrews, 146 Minn. 316, 318, 178 N. W. 959, 12 A. L. R. 1068. It may properly be taken into account in considering the diligence and good faith, or the lack thereof, on the part of defendants Finkelstein and Ruben in guarding the interests of the corporation. Upon such point, as already indicated, it is of much significance, but beyond this it offers no basis for relief. This mortgage, and rights believed to flow therefrom, were matters upon which plaintiffs and interveners have quite largely relied. The court has been unable to agree with their claims in reference thereto.

[12] 8. For further consideration there are the claims on the part of the various plaintiffs and interveners that they have the right respectively to rescind the sales of stock in which they now claim an interest. Such claims are based on the alleged fraud, overreaching, and concealment on the part of defendants. Most of the charges of such alleged wrongdoing, being more particularly violations of the duties of the defendants to individual stockholders, rather than to the corporation as such, were not considered above in connection with wrongs which were more directly against the corporation itself.

In connection with such sales of stock made by plaintiffs and interveners there is a long list of serious charges made against the defendants: There was the prompt action on the part of the defendants, Finkelstein and Ruben, in beginning to acquire the stock; the continuance of such activities after defendant Hamm became associated with them; the fact that one or two men were specially and systematically active therein; that such men made various false and misleading statements to owners of stock; that through roundabout methods of dealing the names of the true purchasers, who were the defendants, were kept concealed; that payment of dividends by the corporation was suspended during the period when most of such stock was acquired; that many of the activities of defendants during such period tended directly to depress the value of the corporate stock; that letters, which were misleading and untrue, were sent to certain stockholders; that misleading financial statements were mailed to the stockholders; and that records were kept in such condition as to baffle any reasonable attempt at finding therefrom the financial status of the corporation.

Certain of these charges, if standing alone, might possibly be explained away in

part, but, taking all together, one gives color to the others, and it is not reasonably possible to avoid the conclusion that all are well proven, and that they evidence a far-reaching scheme for acquiring the outstanding stock of the corporation in disregard of the rights of the minority stockholders, which rights defendants were bound under all the rules everywhere to guard and protect.

[13] These charges are all of a grave character. The persistent failure to keep accurate books of account, and to preserve important records, alone places defendants in an almost hopeless position. In dealing with the property and rights of others, the necessity for keeping such accounts and of preserving such records in cases like this is unqualified, and is apparent to every one. The duty in that behalf is clear and beyond question. Pomeroy, Equity Jurisprudence, section 1063. Dunn v. Acme Auto & Garage Co., 168 Wis. 128, 119 N. W. 297. Red Bud Realty Co. v. South, 96 Ark. 281, 299, 131 S. W. 340; Ithell v. Malone (Sup.) 154 N. Y. S. 275; Smith v. Moore (C. C. A.) 199 F. 689, 697; Gen. Stat. Minn. 1923, § 7470; Revised Code, S. Dak. 1919, §§ 8830–8832.

Failure to perform this duty, and to comply with this obvious requirement, properly entails consequences which follow almost automatically and as a necessary result therefrom. The almost necessary presumption is that the purpose of a failure in this respect has been to cover up or conceal what the records accurately kept would disclose. Bone v. Hayes, 154 Cal. 759, 766, 99 P. 172; Ill. Linen Co. v. Hough, 91 Ill. 63; White v. Rankin, 18 App. Div. 293, 294, 295, 46 N. Y. S. 228, affirmed 162 N. Y. 622, 57 N. E. 1128; Red Bud Realty Co. v. South, 96 Ark. 281, 299, 131 S. W. 340.

There is a compelling necessity for strictly enforcing the provisions of these rules and of this presumption. The failure to keep accurate accounts often means endless confusion from which there is no relief. "No court is equal to the examination and ascertainment of the truth of the claims in much the greater number of cases" where the fiduciary lends his efforts to confuse. King v. Remington, 36 Minn. 15, 25–26, 29 N. W. 352. Almost of necessity, in cases like this, the relief which can be granted will be quite inadequate. This is quite emphatically true in the case at bar. The fiduciary, in such cases, must be required at all hazards to keep clear and accurate records. If he does not, the burden, through the reasonably rigid application of presumptions, must fall on him, and not on other and innocent persons whom he has undertaken to serve, and whose property interests he in large measure controls. In all such cases, and except where satisfactory explanations are made, as, for example, where records are accidentally destroyed by fire, or otherwise, the courts are bound under the law to assume that the persons who fail to produce such records do not want to have them produced, and that it is to their advantage to conceal the truth.

[14] 9. It is reasonably clear that, as against the defendants Finkelstein and Ruben, except as herein otherwise specified, all plaintiffs and all interveners who are parties here are entitled to have the respective sales of their stock rescinded, and are entitled to be restored to their former status as stockholders in the corporation in question. Such rescission carries with it the right to recover from said defendants all moneys received as dividends on such stock, with interest from the time such dividends were paid, against which may be offset pro tanto the amounts paid to plaintiffs and interveners, or their predecessors in interest, for such stock, with interest thereon from the time such payments were made. The rights of plaintiffs and interveners in this respect, as against defendant Hamm, will be separately considered.

[15] 10. Some of the stock here in question was purchased after April 28, 1918. As to such stock, no matter whether the defendant Hamm actually participated personally in any of the alleged wrongdoing in reference thereto, or did not, his conduct in allowing the wrongs to go on, and in accepting the results thereof, amounted in law to a constant adoption and ratification by him, and he is necessarily bound thereby.

11. As to stock purchased prior to April 28, 1918, the situation of the defendant Hamm with reference thereto may be considered at the same time with his rights, and the rights of others against him, in connection with certain other features of the case. Such matters to be jointly considered are as follows:

(a) The accountability of the defendant Hamm with reference to stock wrongfully acquired from individual stockholders prior to April 28, 1918.

(b) His accountability with reference to stock purchased through the agency of the mortgage for $52,000, and that also which was paid for by salaries received by defendants Finkelstein and Ruben from the Miles Theater Company.

(c) His accountability for salaries wrongfully appropriated by Finkelstein and Ruben prior to April 28, 1918, and for matters cov-

ered by the report of the master, and occurring prior to said date.

As already indicated, at the time that the defendant Hamm purchased his interest in the copartnership of Finkelstein and Ruben, the two defendants last named had in their possession and under their control the physical property of the Miles Theater Company, a large number of shares of the stock in that corporation, and large sums of money which had been realized from the management and control of the corporate property, or from the purchase of the shares of stock therein, or, if they had not the money, they were liable to the corporation, and to the former stockholders on account thereof, and they had the property into which such money had been transformed.

Although in their possession, much of this property did not belong to Finkelstein and Ruben. Under the law they were bound to account for and turn over the same to the rightful owners thereof. They were holding such moneys and other property subject to the rightful demands of other people therefor. The obligations of said defendants were not in the nature of detached personal indebtedness unrelated to their connection with the corporation. Such obligations were intimately related to and the outgrowth of the connection of said defendants with the corporation, and were of such a nature that it was at all times impossible to know what their real interest in the corporation was, until the various claims and demands above referred to should be met and satisfied.

12. Under the foregoing conditions, defendant Hamm made his purchase. Were the circumstances of such purchase, or the character of the interest which he acquired, such that in some way he is protected from the demands now made against him and the other defendants? The answer should be in the negative on three grounds:

[16] (a) As to wrongdoing prior to April 28, 1918, with respect to the matters here under consideration, the defendant Hamm may not have known the details thereof. Very likely he did not. As to what he actually knew, we need not stop to consider. Under the law he is equally bound by what he should have known. He acquired his interest and became active in the midst of outstanding mismanagement of the corporation. All this spoke out clearly at the time. It was perilous to purchase under such circumstances. It was much like walking into a fire. He was bound to inquire about practically everything. The state of the books and records alone required this and gave generous warning. The activities after he became interested dovetailed perfectly with those which had gone before. That the later activities were but continuations of the earlier was plainly evident. He either knew of the matters in question, or he allowed himself to remain oblivious to them all, permitting them to go on, and accepting the avails thereof. He must have known of the salaries taken by Finkelstein and Ruben prior thereto, and should have known that such taking was wrongful. He knew of the $52,000 mortgage, and without question knew of the personal covenants to pay the same, which alone were amply sufficient to put him on inquiry as to the character of the obligation and for whose benefit it was entered into. His accountant, who represented him in a careful audit of such books and records as were available, must have had actual knowledge of many of the wrongs complained of, though both he and Mr. Hamm may not have appreciated the legal significance thereof. The interests of the defendant Hamm are therefore subject to the demands referred to, because in law he is deemed to have had notice of the infirmities in the title to that which he purchased.

[17] (b) Apart from any question of notice, the defendant Hamm, in purchasing an interest in the copartnership of Finkelstein and Ruben, took that only which they could transfer to him. He stood in their shoes and took things as he found them. They could not transfer to him that which really belonged to someone else. He was not a bona fide purchaser. He acquired no particular stock certificates, and, if he had, they were not negotiable instruments. 14 C. J. 664, 665; Schumacher v. Greene Cananea Copper Co., 117 Minn. 124, 130, 134 N. W. 510, 38 L. R. A. (N. S.) 180, Ann. Cas. 1913C, 1115. He assumed to receive property to which his assignors had no valid title. He took his share in the assets subject to all valid claims against the same. He was not shielded against such claims by recording acts or otherwise. On these grounds alone the property which he assumed to purchase is subject to the demands referred to.

(c) Another ground of liability, from which there is no escape, lies in the fact that after April 28, 1918, defendant Hamm, with such notice and warning as he had, joined with the other individual defendants in carrying forward the wrongful practices which had long continued, and in that way identified himself with them as fully as if he had been a party thereto from the first. This, briefly, has already been referred to. Following this matter, and passing by many incidents which

lead to the same conclusion, it is clear that, as events unfolded, a time came when Mr. Hamm could not longer, by any reasonable possibility, claim that he did not have notice of the wrongful acts of the other defendants, committed by them prior to said April 28, 1918. He certainly had such notice when this suit was brought, in which he was specifically notified thereof. He acquired it still more definitely when the decision of Judge Booth was filed herein.

Under such circumstances and with such knowledge as he then had, it was his duty to assist in compelling his codefendants to make restitution to the corporation. He did not do so. On the contrary, he denied and defended the wrongs which had been committed. These reached back to the year 1914. This attitude on the part of defendant Hamm was doubtless due to what is ordinarily the very commendable trait of loyalty to one's associates; but under the circumstances of this case it was another mistake of a serious character, and irrevocably bound said defendant to such earlier wrongs, made him a participant therein by adoption, and rendered him liable on account thereof.

13. There remain for consideration and determination certain questions of detail in connection with the relief which shall be granted herein:

(a) A recovery is allowed for considerable sums of money due the corporation and for other amounts due individual plaintiffs and interveners herein. The measure of relief to be granted must be such as is proper and suited to the circumstances of the case. It will not do to make a mockery of a proceeding where many litigants have been so long and seriously contending for their rights. For obvious reasons, it may be highly improper to direct that the moneys here recovered on behalf of the corporation shall be paid into the treasury thereof. That might be paying the moneys back into the custody and control of those from whom the recovery is had. It might defeat effectually the purpose of the suit and be the beginning of another prolonged cycle of litigation. Unless conditions shall ensue which will materially change the situation, the distribution, so far as possible, should be directly to the individuals who will ultimately be entitled thereto. In cases where there is to be a direct distribution such as is proposed here, all who claim a right or interest in the funds must be given an opportunity, under proper conditions, to prove their claims.

For the present, therefore, provision should be made as follows: (1) For the appointment of a trustee or other similar officer, who, under the direction of the court, shall receive and disburse the funds which shall be recovered in the case; (2) that, upon proper notice, all who claim a right to share in the distribution of such funds as shall be collected be required to appear and make proof of their said claims. To the extent that such claimants have a right to prove that they are within the same class as plaintiffs and interveners here, they should have the same relief.

(b) A general view of the relief which may be granted in such cases as this may be had by consulting the following authorities. Many of them go much further than is contemplated here: Proctor v. Farrar (Mo. Sup.) 213 S. W. 469, 477; Miner v. Ice Co., 93 Mich. 97, 116–118, 53 N. W. 218, 17 L. R. A. 412; Hall v. Nieukirk, 12 Idaho, 33, 85 P. 485, 118 Am. St. Rep. 188; Goodwin et al. v. Von Cotzhausen, 171 Wis. 351, 360, 177 N. W. 618; Eaton v. Robinson, 19 R. I. 146, 31 A. 1058, 32 A. 339, 29 L. R. A. 100; Dill v. Johnston (1919) 72 Okl. 149, 179 P. 608; Green v. National Advertising & Amusement Co. et al., 137 Minn. 65, 162 N. W. 1056, L. R. A. 1917E, 784; Meeker v. Winthrop Iron Co. (C. C.) 17 F. 48.

[18] The foregoing authorities have to do mainly with domestic corporations and with the exercise of the general equity powers of the court. It is now well settled that the relief to be granted may be substantially the same in the case of foreign corporations, where the property and officers of the corporation are within the jurisdiction of the court. Burnrite Coal Briquette Co. v. Riggs et al., 274 U. S. 208, 47 S. Ct. 578, 71 L. Ed. 100; Potter v. Victor Page Motors Corp. (D. C.) 300 F. 885; American Creosote Works v. Powell (C. C. A.) 298 F. 417; American Seating Co. v. Bullard (C. C. A.) 290 F. 896; Chicago Title & Trust Co. v. Newman et al. (C. C. A.) 187 F. 573, 576; Corry v. Barre Granite & Quarry Co., 91 Vt. 413, 101 A. 38; Tasler v. Peerless, 144 Minn. 150, 153, 174 N. W. 731; State v. North American, 106 La. 621, 31 So. 172, 87 Am. St. Rep. 309; Wait v. Kern, 157 Cal. 16, 106 P. 98. See, also, 12 R. C. L. 33; 14a C. J. 1337, 1338; Thomas v. Matthiessen, 232 U. S. 221, 34 S. Ct. 312, 58 L. Ed. 577.

[19] (c) The appointment of a general receiver for the corporation will not be seriously considered at this time. Under all the well-considered authorities, many of which are cited above, this may be done. It is hoped and believed that the matter here in-

volved may be adjusted without taking that step.

(d) The individual defendants above named are all equally liable and the defendant Twin City Amusement Trust Estate, which is a holding agency for such individual defendants, is equally bound with them. The property of the corporation and that of the individual plaintiffs and interveners, and the gains therefrom, have been commingled and confused with property of the defendants. The sums found due should therefore be a charge and lien upon the property of the defendants held by the Twin City Amusement Trust Estate.

(e) Other relief discussed in the foregoing pages should be in accordance with the views there expressed.

14. Jurisdiction of this suit is expressly reserved for the purpose of making such further orders therein as may be appropriate or necessary to a full and final disposition of all matters necessarily connected therewith.

Let a decree be prepared by counsel for the prevailing parties in accordance with the foregoing opinion, and upon notice to opposing counsel let the same be presented to the court for examination and approval.