STOUT *v.* OATES.

4-9302                                                 234 S. W. 2d 506

Opinion delivered December 11, 1950.

*Thad Tisdale* and *U. A. Gentry,* for appellant.

*Quinn Glover* and *E. R. Parham,* for appellee.

LEFLAR, J. This is an action brought by W. I. Stout, minority stockholder in the Southern Mattress Co., an Arkansas corporation, to compel J. Carl Oates, Elsie P. Oates, and Sam C. Oates, officers and majority stockholders, to repay to the corporation certain sums received by them as "salaries" during the years 1941-48. The Chancellor found for the defendants and dismissed Stout's complaint. He appeals.

The Southern Mattress Co. was dominated by J. D. Oates, its president, until his death in 1941. Of the 1,000 shares of its stock, J. D. Oates owned 608 shares; his son J. Carl Oates owned 25 (of which 9 were later transferred to J. Carl's wife, Elsie P. Oates); Sam C. Oates (not a relative of J. D. Oates) owned 167 shares; and the remaining 200 shares were owned by H. S. Nixon (100), J. F. Walker (50), and W. I. Stout (50). Shortly before the present suit was filed W. I. Stout purchased the stock held by Nixon and Walker, thus becoming the owner of 200 shares. After the death of J. D. Oates his 608 shares were technically owned by his estate, of which J. Carl Oates was administrator and principal beneficiary.

After his father's death J. Carl Oates was elected president of the corporation and actively administered its affairs until he became ill with tuberculosis in 1947 and went to the Sanitarium at Booneville, at which time his wife Elsie P. Oates was elected vice-president and thereafter shared the work with him. This work involved not only the management of the mattress factory operated by the corporation but also the handling of all purchases of materials and the making of all sales. In

their capacities as officers of the corporation Mr. and Mrs. Oates made many trips to "call on the trade." No other salesmen were employed. Sam C. Oates was secretary of the corporation, and from 1919 on through the period of this litigation he was bookkeeper, payroll clerk and general office manager at the factory. During the later years he was also consulted frequently on matters involving administration of the business, particularly after J. Carl Oates became ill in 1947.

The system used in paying salaries to the corporate officers was one whereby they each received $150 a month throughout the fiscal year, which was the same as the calendar year, then at the end of the year when corporate profits were known they (the officers) themselves determined what additional salary payments for the past year were justified by the business done and profits made. Prior to his death in 1941, J. D. Oates made these determinations by himself for all the officers. After 1941, J. Carl Oates had the principal voice in making the determinations, though he was assisted by Sam C. Oates and, from 1947 on, by Elsie P. Oates. The corporation made a profit on its operations, after salaries were paid, each year during the entire period in question, and substantial dividends were paid for each year up to but not including 1948.

For many years annual meetings of the corporate directors and of the stockholders were held soon after the first of January. It seems that these were regularly attended by all or almost all of the stockholders as well as the directors. At these meetings Sam C. Oates, the secretary, regularly handed out to each director and stockholder copies of a "financial statement" listing the assets and liabilities of the corporation and summarizing by items the income and outgo from the year's operations. The minutes of the meetings do not show that there were formal approvals of these financial statements or of the transactions summarized by them, but it is undisputed that there was never any question raised concerning them.

The last of these annual meetings was held on Feb. 22, 1947, at which the 1946 financial statement was circulated, a board of directors consisting of all the stockholders was elected, and officers were named as already indicated. No meetings were held in 1948 and 1949, but financial statements were sent to all stockholders in the same form as for previous years.

The total amounts paid by the corporation to the various officers for the years in question are as follows:

| Year | President J. Carl Oates | Vice-president Elsie P. Oates | Secretary Sam C. Oates | Total |
|---|---|---|---|---|
| 1941 | $3,000.00 | | $3,000.00 | |
| 1942 | 6,382.50 | | 4,017.50 | $10,400.00 |
| 1943 | 6,778.12 | | 4,121.88 | 10,900.00 |
| 1944 | 6,778.12 | | 4,121.88 | 10,900.00 |
| 1945 | 6,778.12 | | 4,121.88 | 10,900.00 |
| 1946 | 12,000.00 | | 4,800.00 | 16,800.00 |
| 1947 | 6,600.00 | $4,800.00 | 5,400.00 | 16,800.00 |
| 1948 | 4,250.00 | 4,250.00 | 5,100.00 | 13,600.00 |

The annual financial statements, under the head of ''Salaries'', gave total figures only, and not the amounts paid each officer. Actually, the amounts shown under the head of ''Salaries'' each year were larger than the total sums paid to the officers, the figure given for 1948, for example, being $14,216.50, instead of the $13,600.00 shown above, and for 1947 $17,234.00 instead of the $16,800.00 shown above, the difference being apparently attributable to salaries paid to temporary employees. Amounts paid to hired workmen, however, were shown under the separate heading of ''Payrolls''. There is no showing in the evidence that any of the directors or stockholders ever doubted that the ''Salary'' figures set out therein represented payments made primarily to the officers of the corporation, J. Carl, Elsie P., and Sam C. Oates. In fact, it cannot be denied that they knew this.

The records of the corporation, however, show that not all of the payments made to the corporation's offi-

cers were in fact paid as salaries. The corporation's books, kept by Sam C. Oates, designate a part of the payments made during the four years 1942-45 as "stock bonuses", and it appears to us that these so-called "stock bonuses" were not salary payments but were preferential dividends paid to the officers as majority stockholders, and not paid to the minority stockholders. Here are the figures:

| | J. Carl Oates | | | Sam C. Oates | | |
|------|-----------|----------|----------|----------|---------|----------|
| Year | Salary | Bonus | Total | Salary | Bonus | Total |
| 1942 | $4,800.00 | 1,582.50 | 6,382.50 | 3,600.00 | 417.50 | 4,017.50 |
| 1943 | 4,800.00 | 1,978.12 | 6,778.12 | 3,600.00 | 521.88 | 4,121.88 |
| 1944 | 4,800.00 | 1,978.12 | 6,778.12 | 3,600.00 | 521.88 | 4,121.88 |
| 1945 | 4,800.00 | 1,978.12 | 6,778.12 | 3,600.00 | 521.88 | 4,121.88 |

It will be seen at a glance that in each year the basic salaries are fixed in round numbers, just as they were in every other year in question, but the inclusion of the bonuses makes the total payments end in odd cents. The amount of these bonuses can be arrived at to the penny by giving these men a 10% dividend on their respective stock holdings in 1942 and a 12½% dividend in the other three years.

These amounts were included in the salary totals tabulated above, and in the salary reports on the annual financial statements handed to all stockholders and directors. The secretary testified that the recording of this part of the salaries in this form was for bookkeeping purposes only, and did not represent any effort to pay a special dividend to a preferred group of stockholders. In explaining the "stock bonus" form of entry in the corporate books, he said, "I did that of my own accord. No one else but myself knew that I made that entry."

Despite this testimony, it is impossible to believe that these were just bookkeeping entries that nobody else knew about, or that the total "Salary" figures were independently arrived at in advance and the book entries were nothing more than the secretary's special method of making a record. It is of course admitted that both J. Carl and Sam C. Oates participated in fixing the

amount of these "Salaries", and certainly they both knew that the total amounts were determined by adding to the basic salary a percentage of stock ownership.

It is argued that these two men, with no thought of stock ownership, in good faith concluded that in 1943 the fair value of J. Carl Oates' services was exactly $6,778.12, the value of Sam C. Oates' services was exactly $4,121.88, and so on for the other years. Then, by what is now attributed to coincidence, it was discovered that in every one of these four years the odd salary figures corresponded precisely with a given basic salary, plus a percentage of stock holdings and a "stock bonus" entry was made on the books accordingly, for the secretary's private reasons. That contention falls of its own weight; it is contrary to the obvious facts.

There was also some suggestion in the testimony that these stock bonuses were merely a device adopted for income tax purposes. This notion is equally untenable. As to the officers, the sums they received would be subject to the same taxation whether called salaries or dividends. And as to the corporation this device actually increased the corporate tax, since salaries are deductible from the company's gross income but dividends are not. Thus there is no reasonable basis for treating these bonuses as anything except what they were—preferential dividends.

In the annual financial statements these bonuses were concealed under a general heading, "Salaries"; so the minority stockholders were not told what was being done and could not have ratified the payments. The total figures given in the annual statements under the head of "Salaries" admittedly included amounts paid to others than the officers. There was no breakdown of figures whereby the stockholders could tell what amount was being paid to any particular officer. The only ratification which these figures could support would be to the effect that a salary payment in the totals indicated was not out of line for the business. But this would not include a ratification of preferential dividends

paid to the majority stockholders without the knowledge of the minority.

It is of course unlawful for one group of stockholders to pay themselves a dividend that is not shared by all stockholders. In the absence of specific approval by all stockholders, preferential dividends are invalid, and it makes no difference that those receiving the dividends, and therefore presumably approving them, constitute a majority of the stockholders. Fletcher, Corporations, § 5352; Thompson, Corporations, § 5277.[1] And see *Railway Company* v. *Martin,* 57 Ark. 355, 21 S. W. 465; *Jones Lbr. Co.* v. *Wisarkana Lbr. Co.,* 125 Ark. 65, 187 S. W. 1068. Minority stockholders may always attack such preferential dividends, and this is true whether they are formally labeled dividends or not. They are inherently bad.

Nor is the right of minority stockholders to attack these preferential dividends barred by the statute of limitations. Defendants were officers and directors of the corporation, and therefore held these preferential payments as trustees for the corporation and all its stockholders. *Red Bud Realty Co.* v. *South,* 96 Ark. 281, 131 S. W. 340; *Jones Lbr. Co.* v. *Wisarkana Lbr. Co.,* 125 Ark. 65, 187 S. W. 1068. Though the trust was not express, it was the kind of constructive trust as to which the statute of limitations does not begin to run until the concealed right is or should be discovered. *Hardy* v. *Hardy,* 198 Ark. 1021, 132 S. W. 2d 365; *Bovay* v. *Byllesby,* 27 Del. Ch. 381, 38 Atl. 2d 808, 174 A. L. R. 1201; *Ventress* v. *Wallace,* 111 Miss. 357, 71 So. 636, L. R. A. 1917A, 971; Fletcher Corporations, § 5886. Compare *Board of Education* v. *Morgan,* 182 Ark. 1110; 34 S. W. 2d 1063. There is no showing in the evidence that any of the minority stockholders knew or had any ready opportunity to know, before the bringing of the present action, about these preferential dividends the existence of which was concealed by the form of the annual financial statements furnished to them by the officers. We

[1] Numerous cases to this effect are cited in 18 C. J. S. 1113, 13 Am. Jur. 681, and 55 A. L. R. 65.

therefore conclude that the plaintiff, as a minority stock-holder suing on behalf of the corporation, is entitled to judgment against J. Carl Oates and Sam C. Oates for the amounts received by them under the so-called ''stock bonuses'' which were in fact preferential dividends.

As to the other amounts received by defendants, however, the situation is different. The Chancellor found that the total amounts received by the respective defendants were no more than reasonable compensation for the services rendered by them, for which they were without question entitled to be paid. The whole history of the corporation's operations shows that the stock-holders did not expect the officers to work for nothing, to give their whole time to the corporate business without compensation. They were to be paid, and the only question now is whether they were paid too much. In the absence of agreement or contract as to the amount of salary payable, the test seems to be the reasonable value of the services rendered. Fletcher, Corporations, § 2133; Thompson, Corporations, § 1849.

The highest salaries were paid in 1946 and 1947. In 1946 the salary paid to President J. Carl Oates was $12,000, and that paid to Sam C. Oates as secretary, bookkeeper and office manager was $4,800. The total was $16,800. The total profit for the year, before salaries were paid, was $24,501.52, and the net profit, after salaries, was $7,700.52, or 30.80208 per cent of the $25,000 capital stock of the corporation. This was earned from gross sales of the company's product totaling $158,026.12 for the year, for most of which the officers of the corporation were personally responsible.

In 1947 President J. Carl Oates received a salary totaling $6,600, Elsie P. Oates as vice-president received $4,800, and Sam C. Oates as secretary, bookkeeper and office manager received $5,400, for a total salary roll of $16,800. For that year, before salaries were paid, the business showed a gross profit of $21,646.75. After salaries were paid, the net profit was $4,846.75, or 19.387 per cent of the $25,000 capital stock. This was earned from gross sales of $143,362.36 for the year.

For 1948 both profits and salaries went down. The president was paid $4,250, the vice-president $4,250, and the secretary, bookkeeper and office manager $5,100, a total of $13,600. The gross profit for the year was $15,511.50, leaving a net profit after salaries of $1,911.50, or 7.646 per cent on the capital stock, based on total sales of $123,001.80.

Salaries paid for the preceding years, as already set out, were much lower, particularly after the amounts paid as "stock bonuses" are deducted, but sales and profits were correspondingly high. All the evidence indicates that both J. Carl Oates and Sam C. Oates worked hard, performed many of the tasks for which in other corporations additional employees might have been hired, and managed the business wisely and well.

There is much other evidence in the record indicating the amount and type of work done by defendants as managers of the corporate business, as well as the testimony of several officials of similar small manufacturing and sales companies to the effect that comparable or higher salaries are being paid in their organizations. In view of this testimony, we cannot say that the preponderance of the evidence is contrary to the Chancellor's finding as to the propriety of the amounts paid to defendants for their services.

Except as to the amounts paid as "stock bonuses"— the illegal preferential dividends—the decree of the Chancery Court is affirmed. As to the "stock bonuses", the case is remanded with directions to enter a decree in accordance with this opinion.